In the Matter of the Application of THE CITY OF NEW YORK, Relative to Acquiring Title, etc., to the Real Property Required for Additions to Inwood Hill Park and Additions to Isham Park in the Borough of Manhattan, City of New York, as Laid Out upon the Map or Plan of the City of New York, by Resolution Adopted by the Board of Estimate and Apportionment on April 13, 1923, and Approved by the Mayor on April 20, 1923, etc., so as to Provide for the Acquisition of Title to the Real Property Required for Additions to Inwood Hill Park and Additions to Isham Park as Laid Out upon the Map or Plan of the City of New York by a Resolution Adopted by the Board of Estimate and Apportionment on November 21, 1924; and for the Acquisition of a Fee Title to the Real Property Required for Opening and Extending Payson Avenue Where Not Heretofore Acquired between Beak Street and Seaman Avenue, in the Borough of Manhattan, City of New York, in Accordance with the Resolution Adopted by the Board of Estimate and Apportionment on March 13, 1925.

CARL VOELCKER and Others, Appellants; THE CITY OF NEW YORK, Respondent.

First Department, June 13, 1930.

*Martin Conboy* of counsel [*Charles C. Lockwood, Edwin N. Moore* and *Charles W. Tooke* with him on the brief; *Griggs, Baldwin & Baldwin* and *Charles C. Lockwood,* attorneys], for the appellants.

*Joel J. Squier* of counsel [*Arthur J. W. Hilly, Corporation Counsel*], for the respondent.

FINCH, J. This appeal presents for consideration the right of owners of real property, taken in condemnation by the city of New York, to the admission of evidence directly bearing upon the availability of said premises for apartment house sites.

The city of New York desired to enlarge Inwood Hill Park and Isham Park and to extend Payson avenue. It, therefore, commenced this proceeding in condemnation to acquire certain additional lands, pursuant to authority conferred by the Greater New York Charter, section 970 (added by Laws of 1915, chap. 606, as amd. by Laws of 1922, chap. 563). Proceedings were duly had, whereby title to said lands, including those of the appellants, vested in the city as of April 21, 1925. After a trial at Special Term, a first partial and separate final decree was made and entered awarding compensation to the owners of the several parcels of real property taken. From said decree certain of the property owners appeal, upon the ground that the amounts awarded are not commensurate with the market value of the property.

The property taken in this proceeding comprises a large tract of land, approximately 108 acres. It is bounded on the south by Dyckman street, on the west by Inwood Hill Park, on the north by Inwood Hill Park, Harlem Ship Canal and by Isham Park, and on the east by Seaman avenue and Payson avenue. The greater portion of the property of the appellants included in the lands so taken, is located upon a plateau about 220 feet above sea level, one of the highest points upon Manhattan island, and unquestionably a location possessing unusual advantages for residential purposes. One of the experts of the city described some of these advantages as follows: " Well, it is set apart from the business districts and from the traffic centers; it is surrounded by land the contour of which will leave it for all time in my imagination as a place upon which to grow trees, which has its valuable considerations. * * * The outlook — you have from parts of the property taken, you have what I would consider permanent light and air over the Hudson River, and a view north and south on the

Hudson River and westerly to the Palisades. * * * I know of no place on Manhattan Island that is like it. * * * There is no better outlook on Manhattan Island than you have from the top of that hill, the scenic outlook."

Upon the date when the value of the property in question was determinable (*i. e.*, April 21, 1925, when title vested in the city), it had the following means of transportation: The Kingsbridge surface line along Broadway, connecting with the Marble Hill station of New York Central railroad, and with the crosstown line of the Union Railway system; the Broadway division of the Interborough Rapid Transit Company, with stations at Dyckman street, Two Hundred and Seventh street and Two Hundred and Fifteenth streets, and bus service on Dyckman street from the station to the ferry. In addition, there had been approved by the board of estimate and apportionment and by the mayor, the construction of a new line of rapid transit to be known as the Washington Heights Municipal Subway, extending to Dyckman street adjacent to this property and on Broadway as far as Two Hundred and Sixteenth street. The appellants claimed that with its natural advantages and its transportation facilities, the property was available for use as apartment house sites and that such availability should be given due consideration in determining its market value. In support of this contention testimony was adduced on behalf of the appellants that the section of the city adjacent to their lands had been quickly developed with apartment houses since the creation in 1917 of Inwood Hill Park, followed by a great increase in values. The appellants claimed that their lands were equally available for this class of development. They attempted to show that it was both practical and reasonable to apply the lands to that use, by offering in evidence maps of proposed streets and sub-surface improvements and evidence of the cost of constructing the same, also topographical maps showing existing grades and necessary changes of grade in connection with the proposed new streets. The city objected to the receipt of this evidence, claiming that the lands were not available for use as apartment house sites because the tract lacked streets, sewers and other sub-surface improvements required by law as conditions precedent to the erection of apartment houses and that the maps offered had not been approved by the city. The court sustained the objection and excluded all the evidence, with the exception of one map covering a portion only of the property, upon the ground that although the plan proposed by the appellants for the development of the property was physically possible, its actual consummation was highly improbable, because the city had withheld its approval of the maps and plans filed by

the appellants, and there was practically no likelihood of the city ever approving such plans in view of its contemplated taking of the property for park purposes. Although appellants' experts were permitted to express their opinion of the value of these lands based upon availability for apartment houses, the value of this testimony was in effect destroyed by the admission of said experts upon cross-examination that the property could not be used for this purpose without the installation of street and sewer improvements. The awards show that the court rejected valuations based upon apartment house use.

In support of this result, the respondent calls attention to the decision reached on the trial of the former Inwood Hill Park proceeding affecting property on the westerly ridge, title to which vested in the city on December 15, 1917. (*Matter of City of New York* [*Inwood Hill Park*], 197 App. Div. 431.) It was there held that the contention of the owners of the property taken that said property was available for apartment house use, was fanciful and not sustained by the facts. In that case, however, the court received the maps and other evidence offered in support of this contention. That case was decided upon the situation as it then existed, in the light of all the evidence which the owners adduced. The appellants contend that there has been a great improvement in the transportation situation since 1917 and a rapid development of the neighboring property, particularly with apartment houses, thus showing that the site is likewise so available. If upon a new trial the facts adduced sustain this contention, to them we must bow for the facts must be masters of us all. The decision upon the former proceeding in 1917 is thus, obviously, of no bearing upon the present appeal, which involves solely the improper exclusion of material evidence for consideration.

By the exclusion of the aforesaid testimony the appellants were deprived of the right to submit proof of an element of, value, which under well-settled principles of law, they were entitled to have considered in determining the market value of the property taken. In determining this issue the appellants were not limited by the present condition or use of the property. They were entitled to show the most profitable use for which it was available. According to the testimony, such property could most profitably be used for apartment house sites. The appellants, therefore, were entitled to adduce all testimony tending to show the availability of the property for such use. As was said by Mr. Justice McAvoy in *Matter of City of New York* (213 App. Div. 187): " The award is to be made for the fair market value for all available uses and purposes. It is true, too, that market value includes every element of usefulness

and advantage in the property, if it possesses advantages of location or is available for any useful purpose whatever. The fact that the owner has not made the precise use of the place which it is claimed would be its most advantageous employment does not militate against his right to have the value assessed which would make for the highest compensation.

"We said in *Matter of Daly* v. *Smith* (18 App. Div. 194, 197): 'It is doubtless true, and settled by authority, that the landowner is not limited in compensation to the use which he makes of his property, but is entitled to receive its greatest value for any purpose.' And in *Matter of City of New York* (198 N. Y. 84, 88) the court said: 'When the State compels a man to give up his land for public use, and permits him to recover, not what he thinks it is worth, but only its fair market value, he should at least have the right to prove every element that can fairly enter into the question of market value.'"

Also, in *Matter of Bronx Parkway Commission* (192 App. Div. 412; affd., 230 N. Y. 607) it was said: "The alleged error of erroneous principle is the adoption of testimony of 'speculative development.' The defendant adduced considerable testimony from witnesses of whom several were of high standing and of great experience, as to the availability of this land for many different industrial purposes. The petitioner, in turn, called several witnesses of like standing, with particular reference to the availability of the land for railway purposes, who testified to the remoteness of such requirement and the cost of such improvement.

"The fact that the land is vacant makes such testimony in a sense 'speculative,' which word in its origin implies a vision or an outlook. But the marketable value of the land may be considered in the light of its prospective use. Such is the significance of the word 'available' in the expression of the Supreme Court of the United States, 'its fair market value for all available uses and purposes.' (*United States* v. *Chandler-Dunbar Co.*, 229 U. S. 81.) We have stated the rule in *Matter of Bronx Parkway Commission* (191 App. Div. 212, per PUTNAM, J.). And as to the competency, see, also, *Matter of Daly* v. *Smith* (18 App. Div. 197, CULLEN, J.); *Matter of Simmons* (*Ashokan Reservoir, Sec. No. 6*) (130 id. 350; affd., 195 N. Y. 573); *City of Syracuse* v. *Stacey, No. 1* (45 App. Div. 254; affd., 169 N. Y. 231); *Matter of Gilroy* (85 Hun, 424); 2 Lewis Em. Dom. [3d ed.] § 707. In *Matter of Gilroy* (85 Hun, 424), the court, per WILLARD BARTLETT, J., in a learned discussion says, after citation of *Alloway* v. *Nashville* (88 Tenn. 510): 'In the case last cited it is well said that market value "includes every element of usefulness and advantage in the property. If it ·be

useful for agriculture or for residence purposes, if it has adaptability for a reservoir site or for the operation of machinery, if it contains a quarry of stone or a mine of precious metals, if it possesses advantages of location or availability for any useful purpose whatever, all these belong to the owner, and are to be considered in estimating its value. * * *'' ' ''

The exclusion of evidence bearing directly upon this question, under fundamental principles, requires a reversal of the decree, because, as was well stated in the early case of *Rochester & Syracuse R. R. Co.* v. *Budlong* (6 How. Pr. 467): " We do not undertake to pass upon the amount of compensation awarded by the commissioners, whether it is too great or too small. Nor should we feel at liberty to interfere with the report upon that ground, unless the evidence of injustice was palpable upon its face. It is sufficient that the appellant was deprived of evidence that he was entitled to have considered, the judgment of intelligent and competent witnesses, to call upon the court to set the appraisal aside. Whether the evidence offered and rejected improperly, would have influenced the decision had it been received and weighed, it is not necessary to decide. We are to presume, however, that it would have received its proper attention, and had its due weight in the decision.

" It is enough that the appellant was entitled to it, and that it might, had it been received and considered, [have] led to a more favorable determination in his favor. The report and appraisal must, therefore, be set aside, and a new appraisal ordered before new commissioners."

The respondent urges, however, that the case at bar should be excepted from this rule of general application, because the contemplated taking by the city of lands adjacent to the then existing parks, made it practically certain that the city would not approve of plans for the development of such lands for apartment house sites and thus render them available for that use. This contention is untenable. The city could not lawfully thus deprive the owners of the lands taken of their right to receive their true market value. Carried to its logical conclusion, to sustain this contention of the respondent would enable it to prevent any development whatsoever of lands which it might desire to acquire at some time in the future, for the purpose of preventing enhancement of the value of said lands. Such a contention is unconscionable and does violence to established principles of law and equity. As was said by Judge CULLEN in *Matter of Rogers Avenue* (29 Abb. N. C. 361): " So the right to property includes the right to use that property for any lawful purpose of profit to the owner. (*People* v. *Marx*, 3 N. Y. Crim. R. 200.) Whenever that right is restricted, property

is taken within the meaning of the Constitution. Doubtless, all property is subject to the police power of the State and to the rule *sic utere tuo*, etc. But, palpably, an enactment that one shall not improve his property, in order that in case the public should acquire it, it may purchase it cheap, is no exercise of the police power."

This same principle has been widely adopted and applied (*Moulton* v. *Newburyport Water Co.*, 137 Mass. 163, 167).

In England, in *Matter of Lucas and Chesterfield Water Board* ([1909] 1 K. B. 16), a case involving the ascertainment of damages upon the condemnation of lands by a public agency for a water reservoir, it was urged that the availability of the lands for the use for which they were taken should not be considered, because the public agency alone had the right to install a reservoir, and without its consent the owner would have no right to make such a development himself. This contention was rejected as immoral and the rule of law laid down that the owner was entitled to receive the fair value of his land, having regard to its special adaptability and without regard to the possibility of preventing such use by the withholding of any necessary consent.

The owner of lands being entitled to their fair market value for the most profitable use for which the property is available, this use cannot be cut down because the condemnor is in a position to refuse a consent necessary to make available the lands for such use and does so refuse because of the effect upon the price in a contemplated condemnation. Each owner, so long as he is holding the property, is entitled to be considered in the same position as if his lands were not to be sought in condemnation. The appellants having been denied the right of submitting evidence vital to their contention that the property taken was available for the most profitable use, it follows that the decree appealed from should be reversed, with costs to the appellants, and the proceeding remitted to Special Term for rehearing.

McAvoy and O'Malley, JJ., concur; Dowling, P. J., and Martin, J., dissent.

Martin, J. (dissenting). The appellants by this appeal seek to set aside the awards made for real property taken by the city of New York for park purposes.

The facts are similar to those before the court on another appeal (*Matter of City of New York* [*Inwood Hill Park*], 197 App. Div. 431). The physical characteristics of this property (part of which is included in this proceeding) are set forth in the opinion of the

court where it was said: " Inwood Hill is bounded on the south by Dyckman street, on the west by the Hudson river, on the north by the Harlem River ship canal, and on the east by the Dyckman flats, and is formed by two ridges which are separated by a deep ravine extending south from the ship canal. The property acquired in this proceeding is situated on the west slope of the westerly ridge and extends from Dyckman street north to the ship canal. The only access to the westerly ridge is by way of the lower Bolton road, a dirt road varying in width from eighteen to twenty feet, which runs northerly from Dyckman street near the right of way of the New York Central and Hudson River railroad * * *.

" Inwood Hill many years ago was used for residential purposes. During the past thirty years it has gradually fallen into disuse for that purpose and is now used for institutions, so far as any use is made of it. The House of Mercy, an institution to which fallen women are committed by the courts, accommodating 108 inmates, was built twenty or thirty years ago. In 1903 the New York Magdalen Home, now known as Inwood House, purchased property and erected a large building which accommodates 110 inmates, to which fallen women are also committed by the courts. An old building located on Bolton road was converted into a home for consumptives and is known as the House of Rest for Consumptives."

The real property now described in such glowing terms has not changed since the 1917 proceeding. An attempt was then made to show its great value. It developed that it was the typical case of an effort to obtain large awards for real property taken by the city of New York. The whole scheme was exposed in terms which so aptly describe the proceeding that we believe it will be of service to repeat what was then said by the court. Speaking of a proposed plan which was prepared by a landscape architect, Mr. Leavitt, and an engineer, Mr. Wheeler, who is a witness herein, the court said: " This landscape artist and engineer must have received their inspiration from reading ' The Gilded Age,' for their idea savors very much of Colonel Sellers' plan to cut up a Mississippi plantation into corner lots and sell them at the prevailing prices for such lots on Broadway, New York, and thus realize millions. The fact that there would be no tenants for the apartments in this lonely inaccessible spot did not trouble the landscape architect and the claimants' experts any more than the lack of purchasers troubled the Colonel. The plan was altogether too speculative and fanciful to merit the slightest consideration, and the learned justice at Special Term treated it with the degree of respect it deserved by ignoring it. * * *"

In estimating the reasonable market value of the property at

the time it is acquired in proceedings of this kind, the owner is entitled to have considered the adaptability of the land to the purposes for which it could most profitably be used. But it is to be considered only so far as the public would have considered it if the land had been offered for sale. What the owner is entitled to is the value of the property taken, and that is what it is fairly believed a purchaser in fair market conditions would have given for it in fact; what a purchaser, who is not compelled to buy, would pay under ordinary circumstances to a seller who is not compelled to sell. (*People ex rel. Brown* v. *Purdy,* 186 App. Div. 54, 57; affd., 226 N. Y. 635.) But he is not entitled to have his damages based upon a plan of improvement that is speculative and fanciful. (*Matter of City of New York* [*Blackwell's Island Bridge*], 118 App. Div. 274; *Matter of Bronx Parkway Commission,* 191 id. 212; *People ex rel. Strong* v. *Hart,* 216 N. Y. 517; *New York* v. *Sage,* 239 U. S. 57.) The city objected to the reception of the evidence, and moved to strike it out and urges its exception to the rulings of the court as reversible error. How the reception of evidence that was held to present a speculative and fanciful plan and was disregarded by the justice who tried the case can be considered prejudicial is hard to comprehend. It must appear that it has influenced the decision, that the erroneous theory was adopted by the justice, and resulted in an award which is an injustice to one party or the other. (*Matter of City of New York* [*Croton River Dam*], 129 App. Div. 707, 710; *Silver Creek & Dunkirk R. Co.* v. *Baker,* 18 N. Y. Supp. 331.) The mere fact that the court did not accept the testimony of the city's experts as to value does not show that he was influenced by the fanciful and speculative plan presented by the claimants. The court in these proceedings is governed by the same rules as were applied to commissioners in condemnation prior to the adoption of the amendment to the Constitution and the resulting legislation."

Every material point now raised on this appeal was passed upon by this court in the opinion in 197 Appellate Division, 431. In order to set aside the awards herein we must overrule that decision. The same fanciful theory now advanced was testified to by some of the witnesses now offered to prove the great value of this property. The best answer to this whole proposition is that the property has remained undeveloped and is still unimproved and in the same condition it was in 1917, in the face of the fact that the greatest real estate boom known in the history of the city of New York existed in that section during that period. No builders have thought enough of the property to purchase it for improvement,

and no improvements, such as sewers, streets and the like have been made in order to sell the property.

It is contended that improvements have been made to surrounding property which have increased the value of the property now taken. There has been an active real estate market for almost every kind of real property in the city, but this property has remained in the same condition during all these years that it was in prior to the condemnation proceedings of 1917. It was not until these proceedings were commenced that its great value was discovered and the proposed plan of development was devised. This scheme to prepare a map showing an ideal but purely imaginary layout which would justify large awards is not new. In the prior proceeding it was assumed that the property would be improved in the near future as a high-class apartment development. The proof that such a theory was unsound has been demonstrated by subsequent events.

The evidence disclosed that the map now offered in evidence was prepared for the purpose of this proceeding. It was never authorized by any official body or board having power to adopt a map for street purposes in the city of New York. It is not official in any sense and has not been approved by any authoritative body, but is purely an imaginary layout which the city urges is not feasible. This map purports to show how this land may at some future date be used or developed. The property is owned by a number of owners. Their rights must be considered in order to adopt the proposed map. There is no certainty that these owners would consent to any such development or even consider the cost of such an improvement. There is no proof that it is practicable or could ever be accomplished. The best proof that it is not likely to be adopted is that there has been no development of this section, even during the unprecedented real estate boom when almost every desirable piece of property in the borough of Manhattan appears to have been purchased by real estate speculators and developed.

It is admitted that part of this property is unusable and could not be developed for any purpose. The facts have not changed since the opinion in 197 Appellate Division, 431, was written in 1921. The property has not changed; there has been no development, no apparent reason for any increase in value, and no apparent reason for any such values as claimed.

It is argued that the awards are not much larger than the awards in 1917 and, therefore, are inadequate. The city points out, however, that it appealed from the awards made in 1917 upon the ground that they were excessive, and that while the awards were

affirmed, the decisions hold that they are no evidence of value in any other proceeding.

The appellants also point out that the experts for the claimants in several instances testified to values that were less than those that these same experts testified to in 1915. There appears, therefore, no reason for interfering with the awards made, which apparently have been based upon sound values. The contour of the property, together with its inaccessibility, the complete absence therefrom of public improvements and conditions which make values, clearly sustain the awards made herein. The irregular, inaccessible nature of the property was shown in both proceedings.

The maps best illustrate that fact. To use a speculative theory upon which to base awards would result in great injustice. If this property is as valuable as claimed, there is no doubt that it would have had a market long before the commencement of this proceeding.

To permit the claimants to assume that in the future this property may be used for high-class apartments, although there are no improvements thereon at the present time, would be to overlook the fact that the owners of this property are entitled only to its value at the time title passed to the city, and not at some future date when it may possibly be developed to such an extent that it will become valuable. Such a development could take place only after a large amount of money is expended to accomplish that result. It does not appear that any one interested herein is willing to incur the expense necessary to accomplish that result.

We are of opinion, therefore, that the awards were just and proper; that the court properly refused to consider a map showing a non-existent ideal condition upon which to base the awards. In addition, the evidence clearly demonstrates that full value was awarded for the property taken; that the property owners were fully compensated; that the trial justice was careful to reach a result which was just to all the parties concerned.

The decree should, therefore, be affirmed, with costs.

DOWLING, P. J., concurs.

Decree reversed, with costs to the appellants, and the proceeding remitted to Special Term for rehearing. Settle order on notice.