In the Matter of the Town of Hempstead on Behalf of the Town of Hempstead Park District, Relative to Acquiring Title to Real Property for Park Purposes at Seaford, in the Vicinity of Seamans Neck Road.

Supreme Court, Special Term, Nassau County, January 17, 1967.

*Bleakley, Platt, Schmidt, Hart & Fritz* (*Frank A. Fritz* of counsel), for Town of Hempstead. *George M. Levy* and *William Weisman* for claimants in parcels 1 and 2. *Leo F. McGinity* for claimants in parcels 3 and 4. *Carlino & Friedman* for claimants in parcel 5.

HOWARD T. HOGAN, J. In this eminent domain proceeding, the Town of Hempstead has acquired substantial acreage of wetlands for park purposes. The land in question is in Seaford, Nassau County, New York, in the eastern portion of the township. Along the south shore of Long Island are many of these wetlands, which consist of marshland bogs of various depths. In recent years, enterprising builders have found it economically feasible to fill in these areas and to develop them, usually with single-family homes.

Title to all damage parcels vested in the town on June 8, 1965.

*Damage Parcels 1 and 2*

These contiguous parcels, under the same ownership at the time of vesting, were comprised of 51.167 acres in parcel 1, and 4.2598 acres in parcel 2, for a total of 55.4268 acres. They were part of a larger tract owned by these claimants of 65.869 acres, which left 10.48± acres after the taking.

The real estate appraiser for the town approached the problem through the use of comparable sales of acreage, but the town contends that all development costs should be debited against the claimants.

The question has been presented as to whether hydraulic fill was available and to what extent, if any, would the value of the land be reduced in the event hydraulic fill was not available.

The town's appraiser proffers two alternative valuations of the land:

1. If hydraulic fill is available at $1 per cubic yard, the value per acre is $19,500, or $1,080,800 for the 55.4268 acres.

2. If hydraulic fill is not available, the additional cost of truck fill would be $849,450, which would result in a valuation of the property of $231,350.

The claimants assert that the land should be valued on a building plot basis, taking into consideration the costs involved in filling the land to grade. It appears that they obtained permission from the town to fill; that they had prepared subdivision maps which were preliminarily approved by the planning commission; that they had constructed and furnished two model homes in the vicinity of the condemned property; that they had engaged the services of an engineer, architect and broker, among others; and that they had obtained binders and had entered into several contracts for the sale of homes to be built on their entire tract.

Claimants' appraiser, therefore, valued the land on a per plot basis of $8,300 for 176 plots, and $8,800 for 77 waterfront plots, for an over-all value of $2,138,400. From this he deducted $647,594 as the cost of fill, engineering and maps, to calculate the value of the 55.41 acres to be $1,490,806. In addition, he asserts that the remaining land sustained damage in the amount of $39,287 consequential damage and " conjunctive losses."

There is no question but that the highest and best use is for a potential single-family residence subdivision. Where there are no sales of property which may be comparable to the subject property and where the projected costs are reliable and clearly demonstrable, the costs of development should be debited against the award, since the valuation is then made on the basis of a completed subdivision (see *Valley Stream Lawns* v. *State of New York,* 9 A D 2d 149 [3d Dept.]; *Cuomo* v. *State of New York,* 21 A D 2d 724 [3d Dept.]).

However, as the court observed in the *Valley Stream Lawns* case at page 151: " There are, of course, cases where the actual market value of the land which it is proposed to develop is clearly established without dependence upon the development as an accomplished fact. (Cf. *Hazard Lewis Farms* v. *State of New York,* 1 A D 2d 923.)"

The comparable sales and the testimony demonstrate that there is a market for this land when filled and before actual physical subdivision. The question of valuation of the land as filled and ready for physical subdivision can be ascertained without resorting to the adding of projected development cost upon projected development cost and the subtraction of that figure from the advertised selling price of the projected homes.

The town's engineering expert envisions over-all development costs of $2,210,256.50 for these parcels, including not only

hydraulic fill, but also such development items as water mains, piling, bulkheading, street signs, storm drains, and the like, which go far beyond the cost of preparing the land for the installation of these improvements, and which result in distortion and needlessly compound the problem of valuation.

The land value can be determined from the comparable sales pertaining to filled land and allowing for the cost of bringing land to that condition. Claimants have submitted 10 sales of such comparable properties, and 7 of these are included in petitioner's 9 sales. These sales clearly show the prices that a reasonable purchaser, a developer, would pay for a building plot on filled land.

The sales and the testimony show an upward trend in value between 1963 and 1966 for filled meadowland on the order of 1% per month. Claimants' sale number 7-B (petitioner's sale number 6) involves a 34-plot sale of 6,000-square-foot minimum zoned property adjacent to the subject parcels and, according to claimants, represents $8,400 per plot in May 1966. Claimants' sale number 5 (petitioner's sale number 4) represents $8,300 per plot in May 1965 for 25 acres.

The development of the subject property had proceeded to such extent that a reasonable purchaser would consider the value of the acreage on its yield for building plots. Utilizing the stipulated 4.56 plots per acre, the property yields 176 inland plots and 77 waterfront plots.

The comparable sales and the testimony indicate a value of $7,500 for the inland plots and $8,000 for waterfront plots on June 8, 1965. The value in a filled condition for combined parcels 1 and 2 is therefore:

a. Interior plots
176 plots at $7,500................$1,320,000
b. Waterfront plots
77 plots at $8,000................ 616,000
_____
$1,936,000

With respect to fill, the court finds that hydraulic fill was available at the cost of 95 cents per cubic yard, including a 35-cent royalty to the town.

These claimants had obtained a series of resolutions from the town which pertained to the filling of the subject property. They were entitled to their dredging permit in 1964 when the town unilaterally and arbitrarily refused to issue the permit. Claimants herein commenced an article 78 proceeding to compel the

issuance of the permit, and the granting of such relief by the Supreme Court was unanimously affirmed by the Appellate Division, Second Department (*Matter of Rosenstein* v. *Bennett,* 22 A D 2d 853). This order directed that the claimants be permitted to commence phase I of their dredging and filling operation; the three phases which had previously been approved covered claimants' entire tract save some 4 acres.

The court finds that in addition to claimants' estimate of 711,000 cubic yards of fill, the property requires 13,600 cubic yards for losses due to debogging, 20,300 cubic yards for terracing and 15,700 cubic yards for an additional four inches of finished grade throughout the parcels. At 95 cents per cubic yard, the cost of the 760,600 cubic yards is $722,570. The cost of engineering services for the filling operation, preparing and filing subdivision maps, surveys, and the like, is estimated to be $500 per acre, or $28,000. The total estimate of costs involved in filling the property is therefore $750,570, and the indicated value for the two parcels on the day of vesting is $1,185,430.

The petitioner urges that a reasonable purchaser would take into consideration the possibility that he would not be permitted to utilize hydraulic fill. At the time of the condemnation, the Supreme Court's direction that the town issue a permit had been affirmed unanimously by the Appellate Division. In the light of these decisions, a reasonable purchaser would discount any possibility that the town would be able to refuse the issuance of the permits for areas 2 and 3. In fact, a resolution of the board revoking the prior resolutions granting permission to fill was enacted contingent upon a *vacatur* of the restraining order or dismissal of the proceeding. This never came to pass, and there is no evidence that the board took any action whatsoever to vacate those resolutions, nor could it legally do so.

In 1964, the claimants filed a petition for a reduction in real estate taxes on the entire acreage. They asserted that valuation of damage parcel 1 should be at $93,370 and parcel 2 at $6,340, or less than $2,000 per acre. No evidence of ratio was introduced. This statement, however, for tax purposes, will not be permitted to outweigh the more competent and convincing proof of value which was presented by both sides in this proceeding (see *Matter of City of New York* [*Lincoln Sq. Slum Clearance Project*], 22 Misc 2d 260, mod. on other grounds 15 A D 2d 153, affd. 16 N Y 2d 497, mot. for rearg. den. 16 N Y 2d 828).

In addition to the direct damage, these claimants assert consequential damage to their remaining 10 acres. The following

are allowed as representing a diminution in the value of the remaining 10 acres:

1. Additional diking ...................................$ 910
2. Increased cost of fill for the 10 acres,
   116,500 cubic yards at 5¢..............5,825

$6,735

Architect fees, test holes, advertising, model home costs and realty commissions would normally be absorbed by the development and any attempt to apply any portion of these costs to the land taken is speculative and unwarranted. Presumably, the amounts were absorbed by the purchasers of the homes built on the remaining 10 acres.

The claim for the installation of a 12-inch water main instead of an 8-inch is allowed in the amount of $3,965, inasmuch as the additional cost was incurred at the special instance of the town in order to accommodate the proposed town park.

The attorneys, the experts and the witnesses all treated these parcels as one for the purposes of valuation. The court has determined the entire direct damage to the two parcels as $1,185,430, which, when allocated between parcels 1 and 2 on an acreage basis, indicates a value for parcel 1 of $1,092,744 and for parcel 2 of $92,686.

One final observation must be made which applies to all of the parcels in this proceeding and which materially affects the question of value. The town has indicated that hydraulic fill would not be available for the proposed developments because of its statement of public record that a general policy was being adopted which manifested an intent not to grant permission to use hydraulic fill for private purposes. A reasonable purchaser would take this possibility into consideration along with all other factors which would affect his investment. However, the court feels that the effect of the board's " general policy " is not a controlling factor when it attempts to utilize a newly adopted general policy to depress the value of the property which it now condemns (see *Matter of City of New York* [*Inwood Hill Park*], 230 App. Div. 41, affd. 256 N. Y. 556; see also *Matter of Rogers Ave.*, 22 N. Y. S. 27). If hydraulic fill were not available, the land values would be not only substantially reduced, but in the cases of parcels 3, 4 and 5, the value would be nominal.

*Parcels 3 and 4*

The comparable sales submitted by both sides are difficult to apply to these parcels inasmuch as none of the sales are of

landlocked areas, or of land which cannot be presently developed but which should ultimately reach that status.

The petitioner's expert ascribes a raw acreage value of $18,200 for parcel 3 from which he deducts $13,100 per acre as additional cost necessary to produce utility equal to parcels 1 and 2. From the resulting $5,100, he deducts 15% for a risk factor and $1,450 for carrying charges for three years, which indicate a value per acre of $2,900.

Claimants' appraiser ascribes a $40,000 per acre value if the property were filled and deducts the estimated cost of fill and engineering to arrive at a raw acreage value of $19,856 from which he deducts $2,000 per acre for irregular shape. He then applies a discount rate of 20% due to lack of access, resulting in an indicated value of $14,285 per acre.

The greatest item of difference between the two appraisals is the item of projected engineering expenses. To project engineering costs three years into the future is fraught with possibility of error and, even more basically, the inclusion of the costs of foundations, sanitary improvements, streets, curbs, and all public improvements, distort the picture of the value of the raw acreage. As claimants' expert asserts, there are reliable comparable sales of filled land, and it is more reliable to compare filled land with filled land. The court disregards such additional engineering costs and adopts claimants' approach as to these costs.

With respect to parcel 3, the court finds the raw acreage value, before adjusting for the three-year delay, to be $18,500 per acre, based upon the comparable sales adjusted for the sparsity of waterfront and proximity to a marina, and after deducting the estimated cost of fill at $1 per cubic yard and estimated engineering of $500 per acre. The court finds claimants' estimate of a $2,000 per acre deduction for irregular shape is too modest, and sets a more accurate figure of $3,000 per acre for this disability. The resulting $15,500 is further reduced by a risk factor of 15%, which is defined by the petitioner's appraiser as the "factor created by the fact that the development of this landlocked parcel depends entirely upon the completion of abutting properties owned by others plus possible economic changes." The resulting $13,175 represents an investment which must be carried for at least three years. Utilizing petitioner's approach, 6% for three years is $2,370, and the taxes for that time are projected to be $660. While the trend of rapid appreciation in these lands might continue, there is testimony that the values are approaching a ceiling, a value beyond which development becomes an economic impossibility, and accordingly

the full estimated taxes and carrying charges will be deducted. The value per acre of parcel 3 found by the court on the day of vesting is therefore $10,145, which represents $83,665 for the 8.247 acres of parcel 3.

Parcel 4, although similarly landlocked, is more attractive to a purchaser for, despite its smaller size, its shape is almost square and its waterfront considerable. It is separated from the marina by parcel 3.

The court finds the raw acreage value of parcel 4 to be $19,500 per acre, from which the 15% risk factor ($3,000), taxes ($300), and estimated carrying charges at 6% for three years ($3,000) must be deducted. The court finds the value of parcel 4 on the date of vesting to be $13,200 per acre, or $60,865 for the 4.611 acres taken.

With respect to the improvements on parcel 4, the existing building is inconsistent with the potential subdivision even if it survived the filling operation and its taking cannot be compensated. It also appears that a substantial portion of the bulkheading evaluated by petitioner's expert is not located on the subject parcel. The remaining improvements (bulkheading) shall be valued at $2,880 as established by claimants.

*Parcel 5*

This is the southerlymost parcel in condemnation, enjoys great waterfront advantage on two sides, is rectangular in shape, and is a very desirable site for a potential single-family residence subdivision. The petitioner's expert finds that this parcel is superior to parcels 3 and 4. However, it is also landlocked at the present time and cannot be developed until damage parcels 1, 3 and 4 are completed, which will take approximately four years from the date of vesting.

Petitioner ascribes a raw acreage value of $20,930 per acre. He adds increments for less engineering requirements than on parcel 1, and for the desirable bay front location. From this total of $23,700, he deducts his 15% risk factor and an amount for taxes and carrying charges for the projected four-year delay, all of which results in his ultimate value on the day of vesting of $14,450 per acre.

Claimants ascribe a raw acreage value of $23,000 per acre, to which they apply a factor of .79209 for a value on the day of vesting of $18,250 per acre.

The petitioner's approach is difficult to apply in this circumstance because he has increased the value of the parcel by adding an increment for lesser engineering, which results in a base figure of $700 per acre higher than the claimants'.

Disregarding the increment in this case and applying petitioner's method of calculation result in an unrealistically low valuation for this desirable site. The value of this raw acreage is found to be $21,500, or $197,843 for the 9.202 acres. The application of claimants' .79209 factor results in a value of $156,709.

In the court's opinion, the factor utilized by claimants does not cover all risks involved in the development of this land. An additional 5% of risk factor is accordingly deducted, resulting in a valuation of parcel 5 on the day of vesting of $148,874, rounded to $148,900.

Based upon all of the evidence, the testimony, the appraisals, and the court having viewed the properties, the court awards: