James H. Glavin, J.
This claim arises out of the appropriation of all but a small part of the claimants’ land, pursuant to section 30 of the Highway Law. This appropriation is described as Echo Lake-Pines Bridge, S. H. 143, Westchester County, Map No. 15, Parcel No. 25.
The aforesaid map and description were filed in the office of the Secretary of State on July 17, 1963, in the office of the Clerk of Westchester County on July 30, 1964, and it appears personal service thereof together with the notice of appropriation was made on the claimants on July 26, 1963.
The claim was filed with the Clerk of the Court of Claims and served on the Attorney-General on July 27, 1964. By an order of this court, the claimants were granted permission to conform the filing date of their claim with the date of the filing of the Map in the Westchester County Clerk’s office, namely, July 30, 1964. The claim has not been assigned or submitted to any other court or tribunal for audit or determination.
The court adopts the description of the appropriated property as shown on the map and description filed in the West- *906 Chester County Clerk’s office, a copy of which is attached to the claim and incorporated herein by reference.
The chain of title of the subject property into the claimants is as follows: On July 27, 1961 the property was purchased for a consideration of $50,000 by a deed of conveyance from Kipp-Luhmann, Inc., to Millwood Development Corp., recorded in the Westchester County Clerk’s office in Liber 6129 of Deeds at page 266. On the same date as the aforesaid conveyance, Millwood Development Corp. transferred the subject property to Sydney Margolis (one of the claimants), Lawrence H. Furman and Joseph Saravis by deed of conveyance recorded in the Westchester County Clerk’s office in Liber 6181 of Deeds at page 44. Claimants Rosen, Rosenberg and Margolis took title to the premises on March 22, 1962 by reason of a deed of conveyance from Messrs. Margolis, Furman and Saravis recorded April 13, 1962 in Liber 6195 at page 498 in the Westchester County Clerk’s office.
The property which is the subject of the appropriation herein consists of about 14.75 acres measuring approximately 496.56 feet on the easterly side of Sawmill River Road (Route 100) and 642.27 feet on the south side of Mt. Kisco-Millwood Road (Route 133) with direct access to both of these highways. In addition, the land extended 323.90± feet on the westerly side of the Consolidated Edison Company right of way and 699.54± feet on the westerly side of the New York Central right of way. The southerly property line is adjacent to the lands of the Taconie State Park Commission for a distance of approximately 778.50± feet. The subject parcel was located approximately 25 yards north of the intersection of the Taconic State Parkway with Route 100, at the southeast corner of Routes 100 and 133.
At the time of the appropriation the subject property was vacant, unimproved land. It had previously been utilized for greenhouse and flower raising purposes but the structures used in connection with that business were demolished prior to the condemnation. At the time of the appropriation the subject property was zoned “ B-l (designed business zone) ” which limited the use of the land to stores and shops for retail business, business and professional offices, restaurants and service establishments. The claimants’ premises were in proximity to .such population centers as Pleasantville, Chappaqua, Mt. Kisco, Katonah, Yorktown Heights, Ossining and Briar cliff. The subject property, located within the Hamlet of Millwood, in the Town of New Castle, Westchester County, was situated in an area of .rapid population growth, of better-than-average *907 income, larger than average families, and within a maximum of eight minutes’ driving time it was estimated there were 67,000 people.
From the time the claimant, Sydney Margolis, acquired the ' property in July, 1961 until the time of the appropriation, extensive preparation was made to develop the site into a regional shopping center. Although the court did not give any evidentiary weight with respect to valuation on the agreements between the claimants pertaining to the property, the court did find that they substantiated the testimony given with respect to the extensive negotiations and plans made to develop the property. The testimony of Henry A. Porter whose job it was to obtain tenants for the proposed shopping center and approval of plans and specifications from the town authorities, and that of Irving S. Ribicoff, Esq., with regard to the negotiations for leases which culminated in two executed leases with the Chase-Manhattan Bank and the Giant Key Discount store, was unimpeachable. The Giant Key Discount store lease was executed September 20, 1962 for a 22-year base period with four five-year renewal options. The net rental was $75,024 per year for 60,000 square feet. It was a net lease wherein the tenant paid the upkeep, repairs, taxes and insurance. The Chase-Manhattan Bank lease was executed in April, 1963 for a base period of 15 years and a net rental of $14,000 per year for 3,500 square feet. To use shopping center parlance, these were “key” tenants. In addition, several other prospective tenants appeared ready to enter into binding agreements.
In connection with the Chase-Manhattan Bank lease, the testimony of John R. Phillips, branch bank developer for Chase-Manhattan Bank, was most impressive. He prepared a detailed report in order to obtain approval from the State Banking Department and the Federal Banking Board for the Mill-wood Branch. This report, together with preliminary plans prepared for construction of the bank was convincing because of the thoroughness with which the area was studied and the conclusions reached, namely, that a shopping center and branch bank would prosper in the location. In addition, the architectural firm of Ryder, Struppmann and Newmann prepared several plot plans and specifications for construction of the shopping center at the request of the claimants. Herbert C. Struppmann, architect, testified that the construction cost for the building alone would amount to $8 per square foot. The square footage of the building was estimated to be a minimum of 140,000 square feet. A Mr. Raymond Keyes, C.E., testified *908 to site development costs of approximately $450,000 and affirmed the building costs of $8 per square foot.
Community sentiment in the Town of New Castle was strongly in favor of the development of the shopping center at Millwood. Favorable public support was reflected in a letter from the Town Supervisor to the Department of Public Works, protesting the relocation of the new highway through the proposed shopping center. The architects’ plans had been submitted to and reviewed by the town authorities, although the appropriation intervened before final approval was obtained.
The claimants’ valuation of the damages sustained was based not only on the unimproved land value as ascertained by comparable sales but included a 50% increment for the development potential of the property as a shopping center in view of the extensive plans, the executed leases and leases which were on the verge of execution had the appropriation not stymied negotiations. The ■ claimants ’ proof based on the market approach was as follows:

Before Value

•14.758 acres at $15,000 per acre..................$ 221,370.00
Development enhancement (50%)................ 110,685.00
$ 332,055.00 (Rounded to $332,050.)

After Value

.650 acres at $5,000 per acre.....................$ 3,250.
Total damages .................................$ 328,800.
In addition, through the testimony of claimant Abner Rosenberg, the claimants attempted to establish the value of the premises at between $800,000 and $1,000,000 by capitalizing prospective income. However, this approach to valuation was not substantiated other than with the testimony of Mr. Rosenberg, who, it is unquestioned, was an experienced shopping center developer.
The State’s proof emphasized the poor soil conditions of the subject property, the extensive site development costs and the alleged bad faith of the claimants who supposedly had knowledge of the appropriation and continued negotiations and plans merely to build up an award. The State relied, for its main proof of valuation, on the appraisal of one Justus H. Sehwaner. Mr. Schwaner considered the raw value of the land only and discounted completely any development potential as *909 reflected by the efforts the claimants put into the plans and leases. Frankly, the court found neither the testimony nor the appraisal of Mr. Schwaner persuasive. At the trial it was revealed that Mr. Schwaner had erroneously included in his appraisal a comparable sales map which was not related to the property in question and certain figures relating to the development costs were withdrawn by the State. This indicated to the court that Mr. Schwaner had not exercised that degree of care and thoroughness which the State should expect from its appraisers. Mr. Schwaner used the market data approach and his findings were as follows:

Before Value

14.85 acres at $4,500 per acre....................$ 66,825.00
(Bounded to $ 67,000.)

After Value

.742 acres .....................................$ 500.
Total damages .................................$ 66,500, of
which $64,000 were allocated to direct damages and $2,500 were allocated to consequential damages.
Both the State and the claimants agreed that the remaining property (.650 acre) was of very little value except when assimilated with adjacent land or used perhaps for advertising purposes. The court accepts such purpose as the highest and best use of the property after the taking.
After carefully reviewing the evidence the court could not help but be impressed with the good faith of the claimants in their plans for development of the property into a shopping center. There is nothing whatsoever in the record to indicate actual or even constructive notice on the part of the claimants or their representatives to indicate that plans and negotiations should have stopped because of some talk that Boute 100 was to be relocated somewhere in the area. It was wholly possible that only a small part of the claimants’ property would be affected, if at all, and this court accepts the testimony of the claimants that they proceeded on that basis.
The court finds also that the claimants were experienced men in their field. They had developed numerous properties similar to the subject property. They knew what they were doing and proceeded in the usual way to consummate plans and leases and financing for improving the property. It cannot be seriously argued that the development of the property had not progressed beyond the realm of speculation. Therefore, the *910 fair market value of the property should reflect something more than the raw value of the land as alleged by the State.
In Hazard Lewis Farms v. State of New York (1 A D 2d 923) the rule was clearly enunciated that the owner of property was entitled to receive the fair market value of the property taken from him based on the most advantageous use to which it could be put. The court pointed out that all other rules of valuation must be considered subordinate to this end rule.
This court accepts the highest and best use of the property as established by the claimants before the appropriation to be for development of a regional shopping center. That such highest and best use may be considered as long as it is not mere speculation has been affirmed many times by the courts of New York. For instance, in Mattydale Shopping Center v. State of New York (303 N. Y. 974) if was held proper to receive evidence that plans and specifications for erection of a shopping center had been made and filed, that executed leases were in existence, that the claimant was financially equipped to undertake the project, all as having a bearing on the fair market value of the property. This court, in Brighton Plaza v. State of New York (32 Misc 2d 266) again considered the use of vacant property as a shopping center in determining fair market value of the land where plans for construction had been prepared and conditionally approved by the State and local authorities, prospective tenants had been contacted, the zoning had been changed from residential to commercial, and certain site preparations had been made. The principle that an owner of condemned property is not limited in compensation to the use which he actually made of his property but is entitled to receive its market value figured on its most advantageous use as evidenced by “ clearly to be expected future earnings ” was pronounced in St. Agnes Cemetery v. State of New York (3 N Y 2d 37).
An owner is entitled to show, as bearing upon the question of value, any fact which he would naturally and properly bring to the attention of a buyer with whom he was negotiating a sale. (See 4 Nichols, Eminent Domain [3d ed.], § 12.3142, subd. [2].)
In an opinion by Chief Judge Fuld in Levin v. State of New York (13 N Y 2d 87) the law of this State was established that the Court of Claims could receive any evidence such as dealings in property which had been crystallized and were on the road to fulfillment, which a prospective purchaser would consider in determining the price to pay for such property, including the question of prospective rentals. This is not to say that capi *911 talization of prospective rentals in and of itself to determine land valuations is permissible. That procedure has been condemned by the courts and particularly in Levitin v. State of New York (12 A D 2d 6). Hypothetical profits estimated upon a nonexistent business may not be considered as a foundation for capitalizing income. But it is wholly proper to consider the highest and best use to which the property can be put and its influence on a prospective purchaser may be shown in determining fair market value.
In addition, preliminary expenses incurred in developing the property may be considered as part of the fair market value of the property. (Banner Milling Co. v. State of New York, 240 N. Y. 533 [architects, engineers and legal fees determined to be elements in estimating market value]; Brighton Plaza v. State of New York, 32 Misc 2d 266, supra [expenses incurred for plans and site preparation considered in ascertaining fair market value].) Costs and expenses may be admitted in evidence as facts relating to value but not as proof in and of themselves of value. (See 5 Nichols, Eminent Domain [3d ed.], § 20.1.)
After carefully reviewing the evidence, and in particular the comparable sales offered by both parties to substantiate the damages alleged, the extent of the development plans, the expenses incurred both with respect to the plans and the negotiation of the prospective and executed leases, the experience of the claimants, their financial ability and business acumen, the location of the subject property, the site development cost, together with the court’s special viewing of the property, the court has determined a valuation which closely approximates the conclusions reached by the claimants’ appraiser, Ohauncey B. Grillen. However, the court, following the firmly established decisional law of the State of New York, does not consider the capitalization of income approach based on prospective rentals.
Accordingly, the court finds and determines as follows:

Before Value

14.758 acres at $13,500 per acre..................$ 199,233.00
50% development enhancement.................. 99,616.50
$ 298,849.50 (Bounded to $300,000)

After Value

.650 acres at $1,500 per acre....................$ 976.
Total damages ................................$ 299,024.
*912 The amount by which the claimants have been damaged is $299,024, of which $285,525 represents the direct damages and $13,499 represents the consequential damages flowing from the direct taking.
The claimants are entitled to an award in the amount of $299,024 for all damages, direct and consequential, with interest from July 30, 1964 to the date of entry of judgment herein.