■ ·In the Matter of the CITY OF. NEW YORK, Appellant, Relative to Acquiring Title to Real Property for Public School No. 223. MYRON NELKIN, Respondent. In the Matter of the CITY OF NEW YORK, Appellant, Relative to Acquiring Title to Real Property for Stage II Urban Renewal Project. MYRON NELKIN, Respondent.—In a condemnation proceeding, the condemnor, the City of New York, (1) appeals from a final decree of the Supreme Court, Queens County, dated June 22, 1976, which, after a nonjury trial, awarded the claimant $362,601 as just compensation for 48% of claimant's parcel and (2) purportedly appeals from a "first separate and partial final decree" of the same court, dated June 24, 1976, which awarded the claimant $425,000 as just compensation for the balance of the same parcel. Purported

appeal from the partial final decree dated June 24, 1976, dismissed. No notice of appeal was filed from this decree. Final decree dated June 22, 1976, affirmed on the memorandum decision of Mr. Justice Castaldi, dated May 9, 1975, at Special Term. The claimant is awarded one bill of costs. Rabin, Gulotta and Shapiro, JJ., concur.

Lazer, J. P., concurs insofar as the purported appeal from the partial final decree dated June 24, 1976 is dismissed and otherwise dissents and votes to reverse the final decree dated June 22, 1976 and remand the proceeding for a new trial, with the following memorandum: In this condemnation proceeding, the City of New York (1) appeals from a final decree which, after a nonjury trial, awarded the claimant $362,601 for the taking of 48% of his parcel in Block No. 12051 in Jamaica, Queens, condemned for a public school, and (2) purportedly appeals from a separate and partial final decree of the same court which awarded the claimant $425,000 for the balance of the same parcel in Block No. 12051 condemned for an urban renewal project. The issues are (1) whether the claimant is entitled to 100% of the value of the condemned property as rezoned despite the fact that the zoning change, the prerequisite Federal Housing Administration (FHA) financing and the tax abatement sought by him were never obtained; (2) whether the claimant is entitled to dollar-for-dollar reimbursement, by application of the "development enhancement" valuation method, of certain expenses incurred by him during the period between his purchase of the land and its taking; and (3) whether the condemnor's failure to timely file a notice of appeal as prescribed by CPLR 5515 is fatal to its purported appeal from the separate and partial final decree dated June 24, 1976, pertaining to the urban renewal site. The majority is affirming the June 22 decree awarding claimant $362,601 for that portion of the parcel condemned for a public school, while dismissing the purported appeal from the award for the remainder of claimant's property. I concur in the dismissal because the city's failure to timely file a notice of appeal from the June 24 decree is fatal (see, e.g., *Ocean Acc. & Guar. Corp. v Otis Elevator Co.,* 291 NY 254; *Matter of Martin,* 268 NY 665). I dissent, however, with respect to the amount of the award granted for the public school site and would reverse Special Term's decree on the ground that the claimant is not entitled either to 100% of the value of the land as rezoned or to dollar-for-dollar reimbursement for certain expenses incurred in connection with the land during the period of his ownership of it. In December, 1962 claimant purchased a parcel of property in South Jamaica, Queens, for $350,000. As described by claimant's expert witness, the property was located in a "marginal area for speculative rental development". Claimant's plan to build apartment houses in South Jamaica thus involved substantial risk because it could not proceed without low-cost mortgage financing and some form of tax abatement. After entering into the purchase contract in April, 1962 but before the December, 1962 closing, claimant informed the FHA of his prospective purchase and of his intention to apply for mortgage financing under a so-called 221-d-3 program for the construction of three six-story apartment buildings containing a total of approximately 360 apartments. FHA approval of a mortgage under the 221-d-3 program was contingent upon (1) agreement with the claimant on a land value for mortgage purposes; (2) a change of zoning from R3-2 and C2-2 to R-5; and (3) the granting of some form of tax exemption or abatement from New York City. In March, 1963, in the course of his application to the FHA for a low-cost mortgage of $5,500,000, the claimant listed the value of his land as $503,600. Analysis of the reasons for the extensive delays in processing the claimant's applications reveals that the approvals required

from FHA, New York City Housing and Redevelopment Board (HRB) and the City Planning Commission were each dependent upon approvals obtained from the other agencies. The major cause for delay in the grant of final approval by each agency was the question of the value to be attributable to the claimant's land for purposes of obtaining the FHA mortgage. Claimant sought a land valuation on the basis of an R-5 zoning classification (medium density residential) while the FHA's ultimate valuation was based upon an R-3 (low density residential). During the extensive periods of delay while the approvals were being negotiated, the claimant was, of course, obligated to continue carrying the property. In early 1968 the Housing and Development Administration (HDA, formerly HRB) and claimant finally agreed on a land valuation of $481,652 as well as upon other costs of the project. By April 24, 1968 claimant had submitted final plans to the FHA, but final approvals of the loan, tax abatement and rezoning had not, as of that date, been granted. In July, 1968 the HDA advised the claimant that the City of New York was planning to condemn his property for construction of low income housing and a public school. This was followed by an FHA letter dated September 4, 1968 advising the claimant that the processing of his application had been suspended pending action by the city with respect to the site and by an HDA letter dated January 21, 1969 similarly advising claimant of the suspension of the processing of his project. On March 9, 1971, the city condemned approximately 48% of claimant's property for construction of a public school and on September 4, 1974, it condemned the remainder for the construction of low income housing. When the condemnation trial concluded, Special Term awarded the claimant $362,600 for the portion of the parcel condemned for construction of the school and valued the remainder of the property, which had been acquired in the urban renewal condemnation on September 4, 1974, at $392,800. At a subsequent proceeding regarding the urban renewal site, Special Term adopted a time trend factor of 2% per annum for the three and one-half years from the September 4, 1974 title vesting date, resulting in a land valuation of $425,000 for that parcel. The June 22, 1976 final decree which related to the school site, awarded the claimant the value of his property as rezoned plus dollar-for-dollar reimbursement for all expenses incurred in connection with the property. The total award (allocated to the school site according to the ratio of square feet of the parcel to the square feet of the entire area) included $68,022 for real estate taxes for the period January 1, 1962 to March 9, 1971, $137,712 for mortgage interest for the same period, $71,071 in architect's fees, $29,000 in legal fees, and approximately $10,000 in other fees expended in claimant's attempt to obtain financing for the projected development of the site. I believe that the award was erroneous, the decree should be reversed, and the matter remanded for a new trial in accordance with established principles of condemnation law. It is well settled that for purposes of valuing land in a condemnation proceeding an owner is entitled to be considered in the same position as if his property were not sought to be taken (*Matter of City of New York [Inwood Hill Park]*, 230 App Div 41, affd 256 NY 556). The proper method of valuation where there is a probability of a zoning change in the near future is to determine the value of the subject parcel as zoned at the time of the taking and to add an increment ascribed to the reasonable probability of the zoning change (*Masten v State of New York*, 11 AD2d 370, affd 9 NY2d 796; see *Matter of Incorporated Vil. of Garden City [Goodgold—Fowler]*, 9 Misc 2d 693, affd 4 AD2d 783, mot for lv to app den 3 NY2d 708). In determining the amount of such increment, the degree of imminence of the rezoning is

significant *(Matter of County of Nassau [Cohen],* 47 AD2d 555) since the more inevitable and certain the expected zone change, the higher the premium a buyer will likely pay for the probability. "No matter how probable [a zoning] amendment may seem, an element of uncertainty remains and has its impact upon the selling price" *(Masten v State of New York, supra,* p 372) and a discount from full value of the property as rezoned is thus required (see *Masten v State of New York, supra; Matter of Speach v Smith,* 53 AD2d 1024; *Glennon v State of New York,* 40 AD2d 1072; *Yochmowitz v State of New York,* 25 AD2d 930). Absent a contractual provision permitting a purchaser to cancel or otherwise modify contract terms if the expected rezoning fails to occur, it is hardly likely that the purchaser in the real world will pay 100% of the value of property as rezoned for a parcel which at title closing has not achieved that status. Here, despite the fact that the required rezoning was never obtained, Special Term failed to discount the value it fixed for the uncertainty of the future zoning. The court concluded that "the highest and best use of the subject property was for a governmentally financed apartment house" and, accordingly, it fixed a unit land value of $3 per square foot based upon the value of the land as rezoned. Since this portion of the award was based upon an erroneous premise, it is apparent that a new trial is required to ascertain what the appropriate discount should have been. In awarding claimant reimbursement for all his "out-of-pocket" expenses, Special Term relied on the "cost of exploitation and developmental enhancement method" referred to in *Matter of City of New York (Chestnut Props. Co.)* (39 AD2d 573, affd 34 NY2d 800). Not only are the facts in *Chestnut* distinguishable from the facts herein but the case does not support the principle espoused by the claimant, that an owner, whose property is condemned while he is in the process of planning its development, should be reimbursed on a dollar-for-dollar basis for mortgage interest, real estate taxes, and other out-of-pocket expenses incurred during the entire period of ownership. The *Chestnut* claimant had purchased low grade commercial property—an abandoned factory site—and had improved it to the extent that it had become a highly desirable apartment house site in a good residential area with transportation and shopping facilities available nearby (see 39 AD2d 573, 575, dissenting memorandum of Benjamin, J.). By the time of the taking, the claimant had obtained a rezoning, a variance permitting a 30% increase in the permissible rental area, and had demolished existing structures, installed sewers and paved two streets on the site. Nevertheless, the mortgage interest and real estate taxes included in his cost list at the condemnation trial (and inferentially approved by this court) covered only the period of construction and amounted to $43,000, or less than one tenth of the total of approximately $578,000 claimed for site development, construction costs and other expenses up to the time of taking. Here, two thirds of the $323,302 allowed for developmental enhancement expenses by Special Term consisted of mortgage interest and real estate taxes and the period covered ran from date of acquisition to date of taking. The *Chestnut* valuation test, as articulated in *Matter of City of New York (664 Baltic St. Realty Corp.)* (44 AD2d 599) is that the award should be "the price a purchaser would pay for the property in the state of exploitation existing at the time title vests in the condemnor". The test is essentially a market value standard attempting to measure what a willing buyer would pay to a willing seller for the subject site. Where the market value standard is utilized the inquiry continues to be how much a prospective purchaser would be willing to pay for the condemned parcel. Of course, it is logical to assume that a prospective buyer

seeking to develop property for its highest and best use will give considerable weight to the planning for the development of the land and the actions taken toward obtaining the necessary approvals which have preceded his proposed purchase even though no tangible development of the property has as yet taken place. Thus the *Chestnut* court arrived at its award by utilizing the actual sale price of the subject property and increasing it by an amount necessary to compensate the condemnee for "developmental enhancement of the property in preparing it for its contemplated use" *(Matter of City of New York [Chestnut Props. Co.],* 39 AD2d 573, 574, *supra),* as well as time. The rule that under market value analysis actual expenditures which moved the project toward consummation may be considered to have enhanced the value of the property and that it is proper to add such reasonable costs to the land value is not new (see *Specialty Foods Corp. v State of New York,* 46 AD2d 989; *Salomone & Co. v State of New York,* 40 AD2d 916; *Ryan v State of New York,* 39 AD2d 830; *Rustcon Developers v State of New York,* 33 AD2d 582; *Brighton Plaza v State of New York,* 32 Misc 2d 266; *Matter of City of New York [Pelham Parkway Houses],* 197 Misc 70). What seems new in the instant case is the inclusion of simple costs of land maintenance in an award based on market value analysis. While the cost of financing and real estate taxes during construction have been determined to be reimbursable where the summation method of valuation—reproduction less depreciation—is used (see *Matter of City of New York [Salvation Army],* 43 NY2d 512; *D'Amico v State of New York,* 37 AD2d 681; *Lapides v State of New York,* 37 AD2d 755), summation was not the method resorted to here. It seems highly unlikely that the purchaser of a project in its planning or initial construction phases would simply reimburse the seller for all carrying charges, including mortgage interest and real estate taxes paid from the date of the seller's own purchase. Here, Special Term premised its award of "out-of-pocket" costs on the need to compensate claimant for the "years of time, effort and money" expended by him in attempting to obtain final approval of his land site for a government financed housing project. Nevertheless, the court did not directly examine the question of market value and whether the aggregate of claimant's costs in this instance would be reflected in full in the price a willing buyer would pay a willing seller for the property. Special Term's award thus constitutes a holding that the value to be attributed for developmental enhancement is the sum of developmental costs and land carrying costs during the period of a claimant's ownership. Such a holding fails to distinguish between the concept of value achieved by expenditures involved in developmental enhancement and carrying charges paid to maintain property. The distinction is significant because carrying charges are subject to the unique characteristics of the owner's financial capacity, the terms of purchase from predecessors, and other factors which frequently have little or no relationship to the value of real estate. By the logic of the instant award the amount the city would be obligated to pay on condemnation on the enhancement theory would vary with the interest rate on claimant's mortgage and the amount of the tax assessment. By such rationale, the value of the property would have been further enhanced had the interest rate been higher or if the property had been overassessed—for then the city would have been obligated to pay even greater compensation. Finally, the same rationale dictates the conclusion that had the claimant encountered more delay in obtaining approval of his plans (whether due to his unreasonable position as contended by the city or for other reasons inherent in the bureaucratic process) the increase in the mortgage interest and real estate taxes would have increased the value of

his property. Just compensation is not necessarily indemnity, nor is cost synonymous with market value (see *United States v Miller,* 317 US 369; *Banner Milling Co. v State of New York,* 240 NY 533; *Village of St. Johnsville v Smith,* 184 NY 341). In *United States v Miller (supra)* the United States Supreme Court rejected as too broad the proposition that no element which goes to make up value at the moment of taking is to be discarded or eliminated. Costs and expenses may be evidence relating to value but they are not proof in and of themselves of value *(Rosen v State of New York,* 59 Misc 2d 905; see *Banner Milling Co. v State of New York, supra; Village of St. Johnsville v Smith, supra;* 5 Nichols, Eminent Domain [3d ed], § 20.1). In *Banner Milling Co. v State of New York (supra,* p 543), the Court of Appeals, in reviewing a condemnation award, discussed the consideration to be given to certain costs incurred by the owner in connection with the condemned property: "To estimate the fair market value the court no doubt should have considered not only the cost of production, but also the cost necessarily or reasonably expended in bringing the mill or factory into efficient working condition, what has been called the synchronizing of its parts. Architect's fees in making or revising plans, compensation for engineers to carry out the plans or to arrange the factory so as to produce appropriate manufacturing results are all elements which should be considered in estimating the market value. These are things which a seller and a purchaser would consider on a sale. This does not mean, however, that the cost of these various items considered alone and by themselves must be allowed for or that the sum total of all these expenses make up the owner's compensation." Neither *Matter of City of New York (Chestnut Props. Co.)* (39 AD2d 573, affd 34 NY2d 800, *supra)* nor *Matter of City of New York (Atlantic Improvement Corp.)* (35 NY2d 845, revg on dissenting opn 44 AD2d 694) (also relied on by Special Term herein) suggests that a condemnee is entitled to indemnification for all his business expenses incurred with respect to a condemned site, whether or not the expenses enhance the value of the land. In submitting to Special Term evidence of expenses incurred by the claimant in the instant case his counsel declared that "I am not putting before the Court the proposition that the value of this property is a totality of the project but we are putting it before the Court for information * * * This is all I am doing. We are not relying on this as the value." Nevertheless, without any analysis of the relationship between costs incurred and market value, Special Term's award reimbursed claimant 100% for all his costs exclusive of the costs of architect's plans originally purchased together with the subject parcel and approximately $450 in New York State franchise taxes. The conclusion must be that the award in this case was unwarranted in law or fact. Accordingly, I vote to reverse the decree dated June 22, 1976 and to remand the proceeding for a new trial as to the valuation issue.