**RESERVATION ELEVEN ASSOCI-
ATES, a Limited Partnership,
Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 22142.**

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 25, 1969.

Decided July 2, 1969.

Mr. Paul R. Connolly, Washington, D. C., for appellant.

Mr. John R. Hess, Asst. Corporation Counsel for the District of Columbia, with whom Messrs. Charles T. Duncan, Corporation Counsel, Hubert B. Pair, Principal Asst. Corporation Counsel, and Richard W. Barton, Asst. Corporation Counsel, were on the brief, for appellee.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

This appeal arises over the elements of valuation a jury was allowed to consider in a condemnation proceeding. The appellant, landowner, offered to prove at trial that it had been the practice of the District Commissioners to close alleys upon application, and that the "fair value" of the appellant's land should have been established by a method that treated the alleys as closed, or likely to be closed. The trial judge rejected the proffer. He felt that the Commissioners of the District of Columbia had the discretion to refuse a request to close an alley, and there was no showing the refusals in this case were arbitrary. He concluded that the issue of future closings as tendered by the proffer was too conjectural and the possibility too remote for submission to the jury. We affirm the court's order ratifying and confirming the jury verdict and award.

On December 22, 1965, the District of Columbia by eminent domain took the city block of property, known as Reservation 11, between 2nd and 3rd Streets, Northwest, Washington, D. C., facing Constitution Avenue. This block was cut into five smaller sections by two alleys running east-west, and one alley running part way across the block in a north-south direction. In October of

1959, applications were made to close some of this alley space. In November of 1961, another application was made to close all the alley space and to unify the five portions into one single tract. The District of Columbia opposed the closing because the center leg of the inner city freeway, under the plans then being considered, was to go through Reservation 11. The applications were never acted upon.

In the condemnation case, appellant asserted that the failure to close the alleys was arbitrary and that on valuation of its land either the alleys should be treated as closed, or the jury should consider the probability that, absent plans of government for the project, the alleys would have been closed. The jury was not allowed to consider either of these theories in setting the value, and appellant claims error.

1. *General principles in condemnation cases.*

■ The measure of compensation that must be paid in an eminent domain suit is the fair market value of the property being condemned at a time just prior to the taking.[1] Fair market value is:

the price which a willing seller, who is not obliged to sell, would be willing to accept and the price which a willing buyer, who is not obliged to buy, would be willing to pay for the property. This * * * assumes that the buyer is knowledgeable and that the seller is knowledgeable. * * * of all of the present or potential elements of value involved * * *. Fair market value * * * is based upon the probabilities as they appear to the willing buyer and the willing seller.[2]

■ In a condemnation proceeding, the jury's valuation should take into account the highest and most profitable use of the property.[3] Thus if the alleys in this case had been closed, permitting erection of a larger building on the unified block, the value of this more profitable use should be considered. Even if the alleys were not yet closed, but were likely to be closed in the discernible future, absent the condemnation, the jury should take into account the more profitable use that would thereby be made possible. In such a case the value is not set as if the land were already used in the more profitable way, but rather the value should factor in the degree of probability of such future use and its effect on market price. In other words, the jury determines the amount a willing buyer would pay for the "probability" that the needed steps can be taken to allow the more profitable use. If, however, this "probability" of a more profitable use is so remote that it is not likely to affect the market value, the matter should not be submitted to a jury, for that would leave them adrift in a sea of speculation and conjecture. The trial judge, without deciding questions of credibility, has a duty to prevent such speculation by the jury in determining the likelihood of future change and its effect on market value.[4]

2. *The Commissioners' failure to close.*

■ Under the pertinent statutes the Commissioners had discretion whether or not to close an alley.[5] The Commis-

1. United States v. Miller, 317 U.S. 369, 373–374, 63 S.Ct. 276, 87 L.Ed. 336 (1943); H & R Corp. v. District of Columbia, 122 U.S.App.D.C. 43, 44, 351 F.2d 740, 741 (1965).

2. H & R Corp. v. District of Columbia, *supra* note 1, 122 U.S.App.D.C. at 45, 351 F.2d at 742.

3. United States ex rel. & for Use of TVA v. Powelson, 319 U.S. 266, 275–276, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934).

4. H & R Corp. v. District of Columbia, *supra* note 1, 122 U.S.App.D.C. at 45, 351 F.2d at 742.

5. 7 D.C.Code §§ 303, 305, 401 (1967), now handled by the District of Columbia Council, see 7 D.C.Code §§ 303, 305, 401 (Supp. II 1969).

sioners' refusal to close the alleys because of the possibility that they might be needed for the freeway was not an arbitrary abuse of discretion. The alleys in question are "original alleys" and are therefore the property of the United States. It was reasonable for the Commissioners to decline to give away or exchange government property that was likely to be needed in the discernible future.

There is no showing that appellant pursued these refusals before the Commissioners and appellant do not press this matter on appeal.

### 3. *Probability of the alley closing.*

The appellant argues that the probability of the alley closings should have been submitted to the jury. It asserts that this issue of probability should not be affected by the government's past resistance to such closings because that resistance was designed to hold down the market value of the adjacent land and reduce the cost of their contemplated future taking.

 Precedents cited by appellant indicate that a government may not use its regulatory authority (*e.g.* zoning) to deny consent to a landowner's proposed use of his land, merely because it wants to preserve the land for a still different use and to take the land for that purpose at a cheap price.[6] The city must consider the landowner's application for use of his land on its own merits, in the exercise of its regulatory authority, and cannot artificially use another governmental power to reduce the just value cost payable on the exercise of its power to take private property through eminent domain.

The case before us involves entirely different considerations for the city was being asked, in effect, to give away or exchange its own land. The landowner proffered proof that the "practice of

the District Commissioners has for many years been to agree to alley closings where application is made and there is no opposition from contiguous landowners."

The memorandum of the District Judge noted that this case would be like the zoning cases (*see* note 6) if "it should prove to be the fact that the alleys would be likely to be closed but for the first public announcement of a definitive decision to put the freeway across the property." But the 1959 and 1961 applications for closing the alleys, according to the proffer, were opposed by the Highway Department not because its plan then was settled or approved, but merely because there was a possibility the freeway would involve this property. Given the discretion of the District to close the alleys, and the unique characteristics of the property involved, the Judge concluded that:

> [T]he District's past practice is no measure of its possible future conduct. It would be an unrealistic rule of law that required the District to turn over land to private parties under circumstances where it was reasonably likely that the land would have to be later condemned and paid for. It was not shown by the proffer that any situation quite comparable to present one has come to issue, considering the prime location of the site and the substantial area covered by the alleys. *It was not the specific taking that interfered with the alley closings but long-standing amorphous ever-changing plans which might involve the particular property at some indefinite future time in some indefinite future way.* (Emphasis added.)

In this context the Judge held that the landowner had not carried its burden and rejected the proffered issue as too conjectural and the possibility as too remote.

6. Budney v. Ives, 156 Conn. 83, 239 A.2d 482 (1968); Evans v. Mississippi State Highway Comm., 197 So.2d 805 (Miss. 1967); United States v. Meadow Brook Club, 259 F.2d 41 (2d Cir.), cert. denied, 358 U.S. 921, 79 S.Ct. 290, 3 L.Ed.2d 239 (1958); In re Inwood Hill Park, in Borough of Manhattan, 230 App.Div. 41, 243 N.Y.S. 63 (1930).

■ Considering the unique situation noted by the Trial Judge we agree with him that there was no proffer that would warrant the court in submitting such an element of speculative improbability to be considered by the jury in reaching its valuation. The proof offered was not adequate to show that a knowledgeable buyer and seller acting on the proffered evidence just prior to the taking of Reservation 11, would have agreed to a premium based on the likelihood of the closing of the alleys in view of the Commissioners' refusal on two occasions to take such action because of a probable future government need of the land. As the Judge noted in his memorandum, it was not a specific taking that blocked the alley closings but "long-standing amorphous ever-changing plans which might involve the particular property at some indefinite future time in some indefinite future way." The proffer ties the earlier denial of the closing to the highway plans which appellee claims have been under consideration since 1946. These highway plans were not conclusively set, but were still in the proposal stage. Even absent any specific set of highway plans, the evidence does not show anything beyond conjecture that the alley closing would have been approved.

Appellant failed to proffer evidence that absent this specific condemnation, the alleys would probably have been closed. Its proffer of evidence on alley closings failed to focus on this downtown area. It failed to proffer that alleys in the immediate surrounding area had been closed. As in the United States v. Meadow Brook Club case, *supra* note 6, where absent the specific condemnation plans, flight hazards fears would have prevented rezoning, here absent the specific highway plans, general development plans may well have been a sufficient barrier to alley closings to make them too speculative for jury consideration.

### 4. Lack of "taking" compensable under Fifth Amendment.

■ We conclude by pointing out that general plans affecting market value, especially when they depend on a positive grant or exchange from the government, are not a "taking" subject to compensation under the Fifth Amendment.

■ (A) The fact that future governmental needs may operate to prevent an alley closing now does not mean the government must compensate for this lost value on condemning the property. "The law of eminent domain is fashioned out of the conflict between the people's interest in public projects and the principles of indemnity to the landowner." [7] In general there is room for the doctrine that the government cannot use the threat of eminent domain to drive down established market values. But in making this balance, not all effects of government action or plans on value can be compensated.

■ The announcement or even internal consideration of general government planning, long before any condemnation activities, may have an effect on value of lands involved, sometimes a beneficial, sometimes an adverse effect.[8] That the effect is adverse does not mean the government is required to compensate affected landowners for possible decreases in their land value when it comes to select specific properties for its project.[9] Danforth v. United States, 308

---

7. United States ex rel. & for Use of TVA v. Powelson, 319 U.S. 266, 280, 63 S.Ct. 1047, 1055 (1943).

8. *See* Orgel, On Valuation Under Eminent Domain, §§ 98–106 (2d ed.1953).
 As to compensation for increases in various situations, *see* United States v. Miller, 317 U.S. 369, 63 S.Ct. 276 (1943) ; Shoemaker v. United States, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893) ; Kerr

v. South Park Com'rs, 117 U.S. 379, 6 S.Ct. 801, 29 L.Ed. 924 (1886).

9. That the announcement of uncrystallized government plans may affect land values does not of itself suffice to establish standing to protest the plans, *see* Hinton v. Udall, 124 U.S.App.D.C. 283, 364 F.2d 676, cert. denied, Hinton v. United States, 385 U.S. 878, 87 S.Ct. 159, 17 L.Ed.2d 105 (1966).

U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240 (1939), dealt with a situation where the original Flood Control legislation immediately decreased land values. The Court stated that the later time of the actual condemnation of specific property was the valuation time, and that intermediate decreases could effect a lowering of the market value to be paid by the government. *See* 308 U.S. at 285, 60 S.Ct. at 236:

> A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.

*See also* United States v. Certain Lands in the Town of Highlands, 47 F.Supp. 934, 937 (S.D.N.Y.1942):

> It is possible that the long lapse between the time when Congress first publicly evinced an interest in this tract for the uses of the U. S. Military Academy and the commencement of these proceedings thwarted the efforts of claimant fully to subdivide the tract and dispose of home sites and recreational facilities. I know, however, of no method of compensating an owner for such consequences of Congressional action. Legislative debates or even unfounded rumors may affect market values favorably or adversely. The owner is entitled to no more than the market value of the property taken regardless of the myriad influences which combine to annex that value to the property.

 (B) Appellant is in a less favored position than the ordinary landowner whose property is adversely affected by general governmental planning. Appellant is in the position of a landowner seeking to recover an increase in the value of the land attributable to a proposed use that would have been available only if the government agreed either to a grant or exchange of land to make possible a closing of the existing alleys. In United States ex rel. & for Use of TVA v. Powelson, 319 U.S. 266,

63 S.Ct. 1047 (1943), involving a condemnation proceeding for the TVA project, the landowner sought the increased value that would have resulted had he had time to exercise rights under North Carolina law to condemn surrounding lands and thus obtain a larger unit and its more profitable use. The Supreme Court considered that the unexercised power of eminent domain was but a "revocable privilege for which the state cannot be required to make compensation," that it "had no higher dignity than a promise of a gratuity," and was not an interest sufficient to be considered "private property" under the Fifth Amendment. 319 U.S. at 276, 281, 63 S.Ct. 1047. "[T]he sovereign must pay only for what it takes, not for opportunities which the owner may lose." *Id.* at 282, 63 S.Ct. at 1056. Seeking a grant or exchange of city property in order to close alleys and thereby unify land for a more profitable use is the seeking of a privilege from the government. When a government withholds that privilege as a reasonable exercise of discretion it does not thereby subject itself to increase in condemnation awards.

Affirmed.