HAMILTON BANK OF JOHNSON
CITY, Plaintiff-Appellant,

v.

WILLIAMSON COUNTY REGIONAL
PLANNING COMMISSION, et al.,
Defendants-Appellees.

No. 82–5388.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 4, 1983.

Decided March 7, 1984.

Rehearing and Rehearing En Banc
Denied April 20, 1984.

G.T. Nebel, argued, Bass, Berry & Sims, Nashville, Tenn., for plaintiff-appellant.

Robert L. Estes, Thomas M. Donnell, Jr., M. Milton Sweeney, argued, Stewart, Estes & Donnell, Nashville, Tenn., for defendants-appellees.

Before KEITH, KENNEDY and WELLFORD, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

Hamilton Bank of Johnson City appeals from a judgment that as a matter of law it is not entitled to damages for a temporary taking of its property under the fifth and fourteenth amendments. Hamilton's claims arise from appellee Williamson County Regional Planning Commission's refusal to allow Hamilton to complete construction of a residential subdivision.

## I

Hamilton is the successor in interest of the developers of a tract of land in Williamson County, Tennessee. In 1973, Williamson County changed its zoning ordinances to permit cluster residential developments. Under cluster development houses may be built on smaller lots than would otherwise be allowed, upon the condition that sufficient land within the development be left as "open space." In 1973 the planning commission approved a preliminary plat for a proposed cluster development covering 676 acres, to be known as Temple Hills Country Club Estates. A notation on the approved plat indicated that the total number of allowable dwelling units on the tract was 736. However, lot lines were only drawn in for 469 units; the areas in which the remaining 267 units were to be placed were left blank and bore the notation "this parcel not to be developed until approved by the planning commission." The planning commission minutes reflect that the plat was approved after considerable discussion of whether the plat complied with density requirements. The plat was apparently in compliance under one interpretation of the zoning regulations, but not under an alternate interpretation. There was also some disagreement over the method to be used in calculating slopes in order to determine whether the development would violate the requirement that lots not be placed on slopes greater than 25%. The total number of units approved by the planning commission is in dispute. Hamilton introduced at trial a letter signed by six members (a majority) of the 1973 planning commission stating that 736 units had been approved.

Development of the project began. The developers dedicated an easement of open space to the county covering about 245 acres, most of which was to be used as a golf course, they built roads, and they installed sufficient utility lines to accommodate the entire development. Before construction was actually commenced on any particular section, a final plat for that section was submitted for approval by the planning commission. Between 1973 and 1979, the commission approved final plats for several sections. The preliminary plat was also reapproved several times between 1973 and 1979. A witness for Hamilton testified that the developers spent three to five million dollars for improvements to the property during this time.

In 1977, the zoning regulations were changed. The planning commission continued to apply the 1973 regulations to Temple Hills, however, since the project had originally been approved under those standards. This policy changed in 1979, when the planning commission decided to consider plats submitted for renewal under the regulations then in effect rather than those in effect when initial approval had been given. On August 16, 1979, the plat was renewed under the 1979 regulations.

In October 1980, the plat was again submitted to the planning commission for approval. This time the plat was disapproved, for two reasons: non-compliance with density requirements, and lots placed on slopes greater than 25%. In November 1980, Hamilton through foreclosure acquired the property that had not yet been developed and sold. Hamilton submitted a

preliminary plat, which apparently included plans for development of the 258 remaining undeveloped acres by building 476 dwelling units to bring the development's total to 688. The planning commission disapproved this plat on June 18, 1981, listing eight objections.

Hamilton then brought this action against the planning commission under five theories: (1) taking without just compensation; (2) violation of procedural due process; (3) violation of substantive due process; (4) denial of equal protection; and (5) estoppel under state law from not allowing the project to proceed.

After a trial, the District Court granted the planning commission's motion for a directed verdict on the substantive due process and equal protection claims. The case was submitted to the jury on the remaining theories. The jury returned a verdict with answers to special interrogatories to the effect that Hamilton had not been denied procedural due process, but had been denied economically viable use of its property in violation of the just compensation clause of the fifth amendment, and that the planning commission was estopped under state law from requiring Hamilton to comply with the present zoning regulations as opposed to the 1973 regulations. The jury assessed damages against the planning commission in the amount of $350,000 for the temporary taking of Hamilton's property for the period from the disapproval of the plat to the time of trial.

The District Court issued a permanent injunction which required the planning commission to apply the 1973 regulations to Temple Hills consistently with its prior decisions, to approve the plat submitted in 1981, and to comply with ten specific requirements governing its future actions toward Temple Hills.

The District Court then granted judgment notwithstanding the verdict in favor of the planning commission on the taking issue. The court found the evidence sufficient to support the verdict that there had been a taking, but held that judgment on the taking issue would be inconsistent with the jury's finding that the planning commission was estopped from applying current regulations. The court reasoned that:

> Any damages which plaintiff suffered resulted from an attempt by the local government to apply regulations in a manner impermissible under state law. Because the state law itself prevents continued application of those regulations, there can be no taking of property prohibited by the Just Compensation Clause of the Fifth Amendment.

The District Court also modified its permanent injunction to merely enjoin the planning commission from applying post-1973 regulations to Temple Hills, and denied Hamilton's motion for attorney fees.

Hamilton appeals from the judgment notwithstanding the verdict and asks this Court to order judgment based on the jury's damage award. Alternatively, Hamilton argues that the directed verdict on the substantive due process and equal protection claims was in error and requests a remand for trial on those issues. Hamilton also argues that it is entitled to its attorney fees.

## II

This Court has held that:

> On a motion for judgment n.o.v. as on a motion for a directed verdict, the district court must determine whether there was sufficient evidence presented to raise a material issue of fact for the jury.... Furthermore, the standard remains the same when the trial court's decision is reviewed on appeal.

*O'Neill v. Kiledjian,* 511 F.2d 511, 513 (6th Cir.1975). We must view the evidence in the light most favorable to Hamilton, drawing from that evidence all reasonable inferences in Hamilton's favor. *Pike v. Benchmaster Mfg. Co.,* 696 F.2d 38, 40 (6th Cir. 1982); *National Polymer Prods. v. Borg-Warner Corp.,* 660 F.2d 171, 178 (6th Cir. 1981). The District Court's judgment on the taking issue must, therefore, be reversed if the evidence supports an award for a taking of Hamilton's property without

just compensation within the meaning of the fifth amendment. We thus turn to that question.

The Supreme Court has not set forth a clear standard by which to determine whether particular conduct amounts to a "taking" under the fifth amendment." [1] Resolving this question generally requires an ad hoc, factual inquiry. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982); *Kaiser Aetna v. United States,* 444 U.S. 164, 174–175, 100 S.Ct. 383, 389–390, 62 L.Ed.2d 332 (1979); *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

■■■ A taking does not require an actual physical occupation of the property or formal condemnation proceedings. *Amen v. City of Dearborn,* 718 F.2d 789 (6th Cir.1983). The Supreme Court established in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), that governmental regulation affecting an owner's use of his property may constitute a taking.[2] In *Pennsylvania Coal,* a statute prohibited mining coal in such a way as to cause a residence to subside, where the owner of the underground mining rights was not the owner of the surface habitation rights. The Court employed a practical economic analysis to determine that application of the statute effected a taking, saying: "What makes the right to mine coal valuable is that it can be exercised with profit. To make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it." 260 U.S. at 414, 43 S.Ct. at 160.

The taking clause was more explicitly held applicable to zoning regulation in *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). The Court there held that:

The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests, see *Nectow v. Cambridge,* 277 U.S. 183, 188 [48 S.Ct. 447, 448, 72 L.Ed. 842] (1928), or denies an owner economically viable use of his land, see *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 138 n. 36 [98 S.Ct. 2646, 2666 n. 36, 57 L.Ed.2d 631] (1978).

447 U.S. at 260, 100 S.Ct. at 2141. The Court in *Agins* also held that restricting the spread of urbanization was a legitimate governmental purpose. Since this purpose was served by the planning commission's actions now in dispute,[3] our inquiry must focus upon whether Hamilton has been denied economically viable use of its land.

■■■ It is well established that there is no taking merely because the owner's best or most profitable use of the property has been denied. *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). It is similarly true that diminution in property value alone does not constitute a taking. *Penn Central, supra; Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915). The District Court instructed the jury concerning these points, and also told the jury that "there can be no impermissible taking within the meaning of the Fifth Amendment if

---

**1.** The taking clause of the fifth amendment applies to the states through the fourteenth amendment. *Chicago, B. & Q. R. Co. v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

**2.** The Supreme Court has consistently recognized, at least implicitly, that governmental regulation without physical occupation may effect a taking. *See PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62

L.Ed.2d 210 (1979); *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958).

**3.** The planning commission does not claim that its actions were necessary to prevent an immediate serious hazard to the safety or property of the community. The state may require destruction of property that poses such a hazard without paying compensation. *Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928).

the regulations as applied permit economically viable use of the property." Tr. at 2015. *See Penn Central, supra.*

■ The property in question in this case is the as yet undeveloped portion of a residential subdivision. The subdivision as a whole was originally a farm, but the land is generally very hilly and rocky except for the land presently being used for the golf course. An appraiser testified at trial that the land is not suitable for farming or any use other than subdivision development, and that applicable zoning laws would in any event not permit any other use. Indeed, there is no suggestion in the record or from the parties of any alternative, economically viable use for Hamilton's property other than residential. The same appraiser also testified that, if the property were to be developed in accordance with the eight objections listed by the planning commission when it denied approval of Hamilton's development plan, only 67 sites could be used for residences, thus forcing Hamilton to eliminate 409 potential building sites from its proposal to develop 476 additional units. Were Hamilton to complete the development and be able to sell only 67 sites, it would sustain net losses of over one million dollars because of the cost of satisfying the planning commission's eight objections. The appraiser's conclu-

sion, therefore, was that the land had no remaining significant value.[4] As there was no convincing evidence offered to contradict this expert opinion, the evidence supports a finding that the property had no remaining economically viable use.[5]

The planning commission's primary contention on appeal, however, is not that the property retains an economically viable use but rather that Hamilton has never submitted a plat that complies with either the 1973 or the 1977 regulations, and thus never acquired rights in developing the property that could have been taken away by the commission.

The planning commission's argument fails. It is based on factual premises that are inconsistent with the jury's findings regarding the state law estoppel claim. The District Court instructed the jury on the estoppel issue as follows:

[I]f you find that [Hamilton] in good faith made a substantial change in position or incurred extensive obligations and expenses in reliance upon the previous approval of the Temple Hills project by the [planning commission] so that it would be inequitable and unjust to destroy the right to develop Temple Hills which [Hamilton] had acquired, then you should ... find that the [planning commission was] estopped or prevented from

4. Since the evidence is that the land owned by Hamilton was left with *no* remaining significant value, this case is distinguishable from those cases in which mere diminutions in value have been held not to constitute takings because economically viable uses remained.

5. The dissent in its second paragraph seems to imply that the testimony that the planning commission's objections would only allow Hamilton to construct 67 additional units is incredible: "[I]t was virtually conceded that even applying 1979 standards a total 548 units would be approved on the property. Thus elimination of even 409 potential units would leave a substantial number yet to be developed." We have difficulty understanding the dissent's use of these numbers. The 1979 density requirements which would permit at most 548 units on the entire development (of which a part (212 units) is already developed and not owned by Hamilton) were only one of the planning commission's eight objections. Had this been the plan-

ning commission's only restriction on development, Hamilton would apparently have been free to build 336 units in addition to the 212 extant to bring the development's total to 548. (The dissent incorrectly juxtaposes a number referring to the total number of units in the entire development (548) with the number of units (409) that the planning commission's restrictions eliminated from Hamilton's plan to develop 476 units on the undeveloped portion now owned by Hamilton.) If 336 additional units had been permitted, the land may very well have retained an economically viable use. However, the planning commission also listed seven other objections to Hamilton's proposal. The appraiser considered all eight restrictions and concluded that they allowed at most 67 units on Hamilton's property. There is no evidence inconsistent with the appraiser's reasoning or conclusion, and his testimony was sufficient to allow the jury to find that with the eight restrictions Hamilton's property had no remaining economically viable use.

exercising [its] regulatory powers in such a way as to deprive [Hamilton] the right to develop the Temple Hills project.

■ The jury returned a verdict in favor of Hamilton on the estoppel issue. It must, therefore, have found that Hamilton had acquired a right to develop Temple Hills according to the plats that had been submitted. There is sufficient evidence in the record to support such a finding. The planning commission approved plans for the development on numerous occasions, and there is considerable evidence that the planning commission intended to and did approve a maximum of 736 units.

Even if Hamilton had not had a vested right under state law to finish the development, its claim that a taking occurred would not necessarily be foreclosed. Instead of looking to see whether "rights" have been destroyed, the Supreme Court in zoning cases has engaged in an economic analysis of the degree of interference with "investment-backed expectations." "The economic impact of the regulation, especially the degree of interference with investment-backed expectations, is of particular significance." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982). *See also Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 130 & n. 27, 98 S.Ct. 2646, 2662 & n. 27, 57 L.Ed.2d 631 (1978). The jury was entitled to find that Hamilton and its predecessor in interest had a reasonable expectation that the development could be completed, in light of the evidence that the commission approved the preliminary plats on numerous occasions with the knowledge that a total of 736 units were intended. This was the developers' "primary expectation concerning the use of the parcel," *Penn Central*, 438 U.S. at 130, 98 S.Ct. at 2662, and was

backed by considerable investment in land and improvements.

■ The District Court found that there had been a "significant" interference with investment-backed expectations, but nevertheless held that the evidence did not support a taking because it considered the taking verdict inconsistent with the estoppel verdict. In its memorandum opinion the court discussed two reasons for finding the jury's taking verdict unsupported. First, the court reasoned that the estoppel verdict made the denial of property only a temporary one, which could not constitute a fifth amendment taking. A temporary deprivation of property, however, can be a taking and "should be analyzed according to the same framework applied to permanent irreversible 'takings.'" *San Diego Gas & Electric Co. v. City of San Diego*, 450 U.S. 621, 657, 101 S.Ct. 1287, 1307, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting). *See also Kimball Laundry Co. v. United States*, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949); *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); *United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946); *United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945).

■ Second, the District Court apparently concluded as a matter of law that the application of zoning regulations in a manner impermissible under state law, as established by the estoppel verdict, could not be a taking.[6] This argument is belied by the cases which consistently indicate that the *application* of the zoning laws, rather than the mere existence of a valid zoning ordinance, may effect a taking. *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) ("The *application* of a general zoning law to particular property" may effect a taking (emphasis

---

**6.** Carried to its extreme, a holding that a deprivation of property in a manner inconsistent with state law cannot be a taking would have the result in most states that there never could be a taking without just compensation in violation of the fifth amendment. Since most state constitutions prohibit takings without just compensation, see list at 2 Nichols on Eminent Domain § 6.1[3] nn. 28 & 29 (1982 & Supp.1983), such takings would always be inconsistent with state law in those states.

added).);[7] *Hernandez v. City of Lafayette*, 643 F.2d 1188 (5th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982), *aff'd after remand*, 699 F.2d 734 (1983). Since it is the application of the laws or regulations which effectuates the taking, it makes no difference for fifth amendment purposes whether the particular application is consistent with state law.[8]

Although an unlawful application of zoning regulations can constitute a taking, the question remains whether damages are an appropriate remedy. This question was presented to the Supreme Court in *San Diego Gas & Electric Co. v. City of San Diego*, 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981). There the Court was asked to rule that a state must provide damages to a landowner who has suffered a regulatory taking. The California court had held that only injunctive relief was available. Although this question was not answered by the majority of the Court, which held the case non-justiciable for lack of a final order, it was discussed by Justice Brennan in his dissent. The dissent was joined in by four justices. Justice Rehnquist, concurring with the majority, said specifically that he "would have little difficulty agreeing with much of what is said in the dissenting opinion of Justice Brennan,"

450 U.S. at 633–34, 101 S.Ct. at 1294–95; and the majority opinion itself noted that the constitutional merits of the claim were "not to be cast aside lightly," *id.* at 633, 101 S.Ct. at 1294.

■ The dissent, which therefore represented the views of a majority of the Court on this issue, reasoned that the language of the fifth amendment prohibits taking without just compensation, and so a constitutional violation has occurred as soon as an uncompensated taking is effected. The government's duty to pay compensation then arises from the constitutional violation, not from any implied promise or agreement. The dissenting opinion also looked to the purposes of the just compensation clause, stating:

> Invalidation unaccompanied by payment of damages would hardly compensate the landowner for any economic loss suffered during the time his property was taken.

> Moreover, mere invalidation would fall far short of fulfilling the fundamental purpose of the Just Compensation Clause. That guarantee was designed to bar the government from forcing some individuals to bear burdens which, in all fairness, should be borne by the public as a whole.... If the regulation denies the

---

**7.** In *Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), the plaintiffs claimed that the enactment of zoning ordinances which restricted plaintiffs' use of their property constituted a taking. The Supreme Court held that there had as yet been no taking because the plaintiffs had not submitted a development plan and the ordinances therefore had not been applied to the plaintiffs. The plaintiffs were thus "free to pursue their reasonable investment expectations by submitting a development plan to local officials." 447 U.S. at 262, 100 S.Ct. at 2142. Hamilton is in a different position, having submitted a plan which was disapproved for reasons which imply disapproval of any plan which would fulfill Hamilton's reasonable investment-backed expectations.

**8.** The irrelevancy of the taking's validity under state law is illustrated by *Rogin v. Bensalem Township*, 616 F.2d 680 (3d Cir.1980), *cert. denied*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981). In that case, the developer of a condominium project claimed that his property had been taken when he was denied permission to finish the project, after obtaining approval of

his plans and constructing common improvements and part of the condominiums, because the zoning laws had been restrictively amended. A state court, in a separate suit, had declared application of the zoning amendments invalid. The appeal of the state court suit had not yet been decided. Although the Third Circuit held that no taking had occurred because the property retained considerable value, its value having been reduced by the zoning amendments from about three million dollars to about two million dollars, it did not consider the possibility that the invalidity of applying the zoning amendments would preclude a finding that a taking had occurred. *See also Amen v. City of Dearborn*, 718 F.2d 789 (6th Cir.1983) (redevelopment plan undertaken by authority of state Rehabilitation Act, but in violation of that act, effected compensable takings under fifth amendment); *Urbanizadora Versalles, Inc. v. Rivera Rios*, 701 F.2d 993 (1st Cir.1983) (temporary "freezing" of property in violation of state law held a taking).

private property owner the use and enjoyment of his land and is found to effect a "taking," it is only fair that the public bear the cost of benefits received during the interim period between application of the regulation and the government entity's recission of it. The payment of just compensation serves to place the landowner in the same position monetarily as he would have occupied if his property had not been taken.

450 U.S. at 655–57, 101 S.Ct. at 1305–07 (footnotes deleted). Justice Brennan therefore thought that:

> [O]nce a court establishes that there was a regulatory "taking," the Constitution demands that the government entity pay just compensation for the period commencing on the date the regulation first effected the "taking," and ending on the date the government entity chooses to rescind or otherwise amend the regulation.

450 U.S. at 653, 101 S.Ct. at 1305 (footnotes deleted). We agree with Justice Brennan's reasoning and hold that compensation must be paid for a temporary regulatory taking.

 The jury's finding that the planning commission effected a taking of Hamilton's property was therefore supported by the evidence, and judgment notwithstanding the verdict was improper. The jury was correctly instructed on the question of damages under the theory of a temporary taking and awarded $350,000 in damages. This amount is supported by expert testimony, so Hamilton is entitled to the jury's verdict and judgment should be entered in its favor for $350,000.

### III

The District Court granted directed verdicts in favor of the planning commission on Hamilton's substantive due process and equal protection claims. On appeal, Hamilton now argues that these rulings were in error. However, Hamilton presents these arguments as an alternative to its taking claim and asks for no relief beyond that requested under the taking claim. In light of our decision on the taking question, therefore, we need not reach these issues.

Hamilton also appeals the District Court's denial of attorney fees under 42 U.S.C. § 1988. That statute by its terms provides that an award of attorney fees is a matter for the discretion of the court. We must, therefore, remand the case so that the District Court may exercise its discretion in determining whether Hamilton is now entitled to attorney fees.

Accordingly, the judgment of the District Court is reversed and remanded for proceedings consistent with this opinion.

WELLFORD, Circuit Judge, dissenting.

I would agree with the majority's conclusion that "the Supreme Court has not set forth a clear standard by which to determine whether particular conduct amounts to a 'taking' under the fifth amendment." [1] I would also agree with its conclusion that "the purpose served by the Planning Commission's actions now in dispute ... [is] ... a legitimate public purpose." It seems clear that depriving the owner of the most profitable use of land and the fact that governmental planning or zoning action substantially diminishes the value of land does not amount to a taking. *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

The testimony of the Bank's expert, Hunt, in this case was that if the Planning Commission's actions, as interpreted by the Bank's employee (Ragsdale) would admit only 67 additional building sites on the contested property, and would eliminate 409 potential building sites from the development plan, there would be a loss in excess of $1,000,000 to the developer. Hunt was of the opinion, based on this assumption,

---

**1.** "There is no set formula to determine where regulation ends and taking begins." *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962), cited by the dissent in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 3179, 73 L.Ed.2d 868 (1982).

that the property would have no significant market value "other than that which someone would pay for open space." Examination of the record before us, however, indicates that it was virtually conceded that even applying 1979 standards a total 548 units would be approved on the property. Thus, the elimination of 409 potential units would leave a substantial number yet to be developed. There was no evidence of a formal request by appellant for a variance to permit as many as 267 additional allowable dwelling units for future development as set out on the original 1973 preliminary plat and approved by the Planning Commission on later occasions; rather, appellant insisted that it had vested rights to develop 409 (or more) potential units. In sum, evidence in the case does not clearly indicate to me that economically viable use of the property was denied.

Even if the jury verdict in this case did establish a temporary deprivation and a denial of economically viable use of a part of the property, as apparently the district judge concluded that it did, I would agree with his ultimate holding that "... the temporary interference with the plaintiff's development backed expectations and any temporary dimunition in value of the property, whether styled as a 'temporary taking' or otherwise, ... is essentially a question of law." He concluded that under the circumstances plaintiff was not entitled to damages as a matter of law since it could proceed under 1973 zoning regulations by reason of estoppel. Defendants, moreover, have insisted all along that plaintiff has never been in compliance with the 1973 zoning laws and regulations pertaining to allowable slope (building on a lot in excess of 25 degree slope not permitted) and with respect to some reduction of allowable units on the property because of elimination of some of the acreage by reason of its acquisition by a public authority for other purposes.

This case is really a quarrel over to what extent a "cluster" development of residential units is permitted on a parcel of land. The zoning ordinances or regulations on their face do not amount to a taking of the Bank property, which was acquired with notice of the application of these ordinances and regulations made by defendants. *Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). I agree with the trial judge's conclusion that there has not been any taking requiring judgment under the Fifth Amendment.

Even if the appellants' ability to sell their property was limited during the pendency of the condemnation proceeding, the appellants were free to sell or develop their property when the proceedings ended. Mere fluctuations in value during the process of governmental decision-making, absent extraordinary delay, are "incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense." *Danforth v. United States,* 308 U.S. 271, 285 [60 S.Ct. 231, 236, 84 L.Ed. 240] (1939). *See Thomas W. Garland, Inc. v. City of St. Louis,* 596 F.2d 784, 787 (CA 8), *cert. denied,* 444 U.S. 899 [100 S.Ct. 208, 62 L.Ed.2d 135] (1979); *Reservation Eleven Associates v. District of Columbia,* 136 U.S. App.D.C. 311, 315–316, 420 F.2d 153, 157–158 (1969); *Virgin Islands v. 50.05 Acres of Land,* 185 F.Supp. 495, 498 (V.I. 1960); 2 J. Sackman & P. Rohan, Nichols' Law of Eminent Domain § 6.13[3] (3d ed. 1979).

*Agins,* n. 9 at 263, n. 9 100 S.Ct. at 2143.

The judgment of the California Supreme Court in *Agins* that the sole remedies available in an inverse condemnation claim, arising out of zoning activity similar to that made by the Bank here, were mandamus and declaratory judgment, was not disturbed by the United States Supreme Court.

There has been no physical invasion by defendants of plaintiff's property, either temporary or permanent. A "taking" of the property can be less readily found under these circumstances. *Penn Central Transp.,* 438 U.S. at 124, 98 S.Ct. at 2659; *Loretto v. Teleprompter, supra.*

More importantly for the present case, in instances in which a state tribunal

reasonably concluded that "the health, safety, morals, or general · welfare" would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests. See *Nectow v. Cambridge*, 277 U.S. 183, 188 [48 S.Ct. 447, 448, 72 L.Ed. 842] (1928). Zoning laws are, of course, the classic example, see *Euclid v. Ambler Realty Co.*, 272 U.S. 365 [47 S.Ct. 114, 71 L.Ed. 303] (1926) (prohibition of industrial use); *Gorieb v. Fox*, 274 U.S. 603, 608 [47 S.Ct. 675, 677, 71 L.Ed. 1228] (1927) (requirement that portions of parcels be left unbuilt) . . . .

*Penn Central Transp. Co.*, at 125, 98 S.Ct. at 2659.

The Supreme Court in *Agins* did not decide whether the state (or defendants in this case acting as agents of the state) must pay damages to a landowner when claiming a taking under a regulatory ordinance, because it found no taking had been established. That same issue arose in *San Diego Gas & Elec. Co. v. City of San Diego*, 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981), and Justice Blackmun, writing for the majority, stated, "we again must leave the issue undecided." 450 U.S. at 623, 101 S.Ct. at 1289, and *see* n. 9 at 629, 101 S.Ct. n. 9 at 1292. I do not interpret Justice Rehnquist's concurring opinion in San Diego as adopting the reasoning of the minority four Justices in that case, that a temporary taking by reason of regulatory actions pursuant to zoning ordinances should be viewed in the same fashion as a permanent taking. Justice Rehnquist states only: "I would have *little* difficulty in agreeing with *much* of what is said in the dissenting opinion of Justice Brennan." 450 U.S. at 633, 101 S.Ct. at 1294 (emphasis added). *See also, Loretto v. Teleprompter, supra,* wherein the majority [2] pointed out:

> The court concluded [in *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958) ]

that the temporary though severe restriction on use of the mines was justified . . . .

102 S.Ct. at 3174.

The Supreme Court seems to imply that in a temporary taking where there is no invasion, physical occupation, or "seizure and direction" by the state of the landowner's property, no compensation is mandated. *Central Eureka* is cited, as apparently still good law in *Teleprompter*, 102 S.Ct. at 3174. In *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), where 87½% of value was taken by an ordinance precluding existing use, no compensation was found due.

Even if the trial judge reached his decision that compensatory damages were not allowable on the rationale that the zoning regulations were being applied in a manner inconsistent with Tennessee law, I would conclude that he, nevertheless, reached the right decision. Properly considered, there was questionable evidence in this case, at best, that all economically viable uses of the property had been even temporarily taken, or that reasonable "investment-backed expectations" had been arbitrarily eliminated. Plaintiff succeeded, moreover, in obtaining a declaratory judgment and injunction requiring that 1973 ordinances and regulations apply to future development of its property. I would not disturb the district court's decision in that respect.

In summary, I would conclude that the effects of defendants' actions did not "completely deprive the owner of all or most of [its] interest in the property." *San Diego*, 450 U.S. at 653, 101 S.Ct. at 1304. *See, Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). I would conclude further that even a temporary deprivation of the Bank's "investments-backed expectations" under the circumstances here does not establish an entitlement to compensatory damages. I do not agree that Justice Brennan's dissent in *San Diego* represents the views of a majority of the Supreme Court on this issue.

**2.** Justice Brennan, dissenting; Justice Rehnquist with the majority. ·

The majority has not cited a single case allowing compensatory damages in a case where there has been a temporary interference with a landowner's right to *develop* his property in some economically viable fashion by reason of zoning actions, not involving an invasion of the property, occupation of it, or temporary seizure and possession of it.

Cases cited by the majority do not, in my view, support the result which they reach. *Urbanizadora Versalles, Inc. v. Rivera Rios*, 701 F.2d 993 (1st Cir.1983), for example, held that a landowner whose property had been completely frozen by state zoning and regulatory actions, was entitled to declaratory and injunctive relief, but not to compensatory damages. *Rogin v. Bensalem Township*, 616 F.2d 680 (3d Cir.1980), held that no taking at all had occurred. *Kimball Laundry Co. v. United States*, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949); *United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945), and *United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946), all involved condemnation actions by the federal government for complete temporary taking of a fee, or a leasehold, or part of a leasehold. All are inapposite here. *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), involved the setting aside of a Court of Claims award for a taking because of airplane overflights. The pertinent holding in *Hernandez v. City of Lafayette*, is as follows:

> However, in cases such as the one before us, where the application of a general zoning ordinance to a particular person's property does not initially deny the owner an economically viable use of his land, but thereafter does come to a result in such a denial due to changing circumstances, or where a zoning classification initially denies a property owner an economically viable use of his land, but the owner delays or fails to timely seek relief from such a classification, [by petitioning for rezoning, or contesting the initial general zoning regulation prior to its passage] we conclude that a "taking"

does not occur until the municipality's governing body is given a realistic opportunity and reasonable time within which to review its zoning legislation vis-a-vis the particular property and to correct the inequity.

During the pendency of such proceedings to review and correct a zoning classification that denies an owner any economically viable use of his property, "[m]ere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.'" *Agins v. City of Tiburon*, 447 U.S. at 262–63 n. 9, 100 S.Ct. at 2142–43 n. 9 (quoting *Danforth v. United States*, 308 U.S. 271, 285, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939). Accord, *Thomas W. Garland, Inc. v. City of St. Louis*, 596 F.2d 784, 787 (8th Cir.), *cert. denied*, 444 U.S. 899, 100 S.Ct. 208, 62 L.Ed.2d 135 (1979); *Reservation Eleven Associates v. District of Columbia*, 420 F.2d 153, 157 (D.C.Cir.1969).

643 F.2d 1188 (5th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982), *aff'd after remand*, 699 F.2d 734 (1983).

In a footnote, the court further stated:

> We believe that such a rule is consistent with the "weight of authority ... that in order to constitute a taking, the condemnor must have an intention to appropriate ...." *Porter v. United States*, 473 F.2d 1329, 1336 (5th Cir.1973). *Accord, J.J. Henry Co. v. City State* [188 Ct.Cl. 39], 411 F.2d 1246, 1249 (1969). The City of Lafayette under the circumstances of this case would lack an intention to deny plaintiff an economically viable use of his property until it was put on notice that its zoning regulations were effecting such a denial. *But see San Diego Gas & Electric Co. v. City of San Diego*, 450 U.S. 621, 657 [101 S.Ct. 1287, 1307, 67 L.Ed.2d 551] (1981) (Brennan, J., dissenting).

Thus, for the reasons stated, I respectfully dissent from the opinion of the majority and would affirm the decision of the district judge.