Dorothy BOYD et al., Plaintiffs,

v.

Carol BROWNER, Administrator United
States Environmental Protection
Agency et al., Defendants.

Civ. A. No. 94–0893 (JR).

United States District Court,
District of Columbia.

Aug. 9, 1995.

Bruce J. Terris, Monica Blong Wagner, Terris Pravlik & Wagner, Washington, DC, for plaintiffs.

Anne L. Weismann, U.S. Department of Justice, Civil Division, Washington, DC, for defendants.

## OPINION

ROBERTSON, District Judge.

In 1992, some eighty African–American homeowners living on a tract of chemically contaminated land in Texarkana, Texas, sold their residences to the United States Army Corps of Engineers, which was acting as agent for the Environmental Protection Agency. The homeowners also accepted government relocation assistance. The homeowners, now plaintiffs, claim in this action that the Government threatened and coerced them so that they sold their houses for too little money and accepted too little in relocation payments. They compare their treatment with that given to the inhabitants of seven white communities acquired by the EPA in similar circumstances and claim that they were discriminated against on the basis of their race.

Plaintiffs assert that defendants acted arbitrarily and capriciously and abused their discretion in violation of the Administrative Procedure Act, 5 U.S.C. § 706; that defendants made inadequate relocation payments in violation of the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. §§ 4621, 4623; and that defendants violated their Fifth Amendment rights and the Fair Housing Act, 42 U.S.C. § 3604 *et seq.* They seek rescission of their sales agreements and additional compensation. Before the Court is defendants' motion to dismiss or for summary judgment. Plaintiffs have filed a cross-motion for partial summary judgment. For the reasons stated below, and upon review of the entire record, defendants' motion for summary judgment will be granted.

### Facts

Carver Terrace was a residential subdivision built on land that had formerly been the

site of a wood treatment facility. Seventy-nine homes and a church were built there in the 1960's. Soil and groundwater contamination was discovered in 1981. In 1990, Congress appropriated $5 million to EPA for the purchase of Carver Terrace homes and the relocation of Carver Terrace residents. *See* Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1992, Pub.L. No. 102–139, Title III, 102nd Cong., 1st Sess., 105 Stat. 736, 764 (1991) ("Appropriations Act"). In 1992, Congress appropriated an additional $612,000 for this purpose. *See* Appropriations Act of 1993, Pub.L. No. 102–389, Title III, 102nd Cong., 2nd Sess., 106 Stat. 1571 (Oct. 5, 1992).[1]

The Corps of Engineers was EPA's agent for appraising and acquiring Carver Terrace properties and arranging the relocation of residents. EPA instructed the Corps to appraise the properties as if they were uncontaminated and to pay "clean value" or pre-contamination value for them. Carver Terrace residents were informed that the appraisers would disregard the fact that the homes were sited on contaminated property.

The Corps made purchase offers to Carver Terrace landowners by means of hand-delivered letters. Each letter stated that an appraisal had been made and set forth the value assigned by the Corps as a result of that appraisal. Each letter also contained the following language:

> Your property is being acquired on behalf of the EPA. If we are unable to negotiate a direct purchase from you, it will be necessary to acquire the property through condemnation proceedings. This information is not to be considered a threat, but in our opinion, it is necessary that we provide it to you so that you are fully informed of the laws and procedures applicable to this acquisition program. Please be assured that we will make every effort to negotiate a fair settlement with you. Should it be necessary to acquire your property through condemnation proceedings, the

property will be reappraised. The Department of Justice, who will represent the United States, has directed that the reappraisal be based on the value of the property its actual condition, which would necessitate consideration of the fact that the property is located within an environmentally unsafe area. This, in all probability, would lower the appraised value of your property.

Plaintiffs assert that they understood this language as threatening. That assertion of their understanding—as distinct from the Corps' intent—is accepted as true for purposes of this motion, as are all of plaintiffs' allegations of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Washington Post Co. v. United States Dept. of Health and Human Services,* 865 F.2d 320, 325 (D.C.Cir.1989). Thus, it is also accepted as true that, from 1978 to 1994, the EPA relocated at least seven non-minority communities exposed to hazardous chemicals[2] and that offer letters sent to residents of those communities were substantially similar to those used at Carver Terrace except that they did not advise homeowners that the properties would have to be condemned based on their contaminated value if negotiations failed. Three of those seven acquisitions were performed by the Federal Emergency Management Agency. The Corps of Engineers conducted and wrote the buyout letters for the other four. Oral statements about condemnation were allegedly made at Times Beach location but were withdrawn when protested.

### *Claim for Judicial Review*

■ Plaintiffs' claim for judicial review under the APA is that the offer letters violated Congress' intent that the Carver Terrace owners receive "clean value" for their homes. In order to sustain that position, however, plaintiffs must first point to some "final agency action." They cannot do so here.

---

1. All but $207,059 of these appropriated funds have been spent.

2. Love Canal, New York; Times Beach, Missouri; Forest Glen, New York; Uniontown, Ohio; Montclair, New Jersey; United Creosoting, Texas; Lansdowne, Pennsylvania.

Agency action is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The Corps of Engineers' letters announced no rule of law, imposed no obligation, determined no right or liability, and fixed no legal relationship. *See Industrial Safety Equipment Assoc., Inc. v. Environmental Protection Agency,* 656 F.Supp. 852, 855, *aff'd,* 837 F.2d 1115 (D.C.Cir.1988) (citing *American Trucking Assoc., Inc. v. United States,* 755 F.2d 1292, 1296 (7th Cir.1985)). The letters provided information. The fact that plaintiffs understood them as threatening does not make them "threats," nor does it make them final agency action.

■ Even if the letters amounted to final agency action (ruling that fair market value rather than "clean value" would be paid in condemnation proceedings), plaintiffs have not shown that such a ruling would have been unlawful. The condemnation process does measure "just compensation" by fair market value. *See, United States v. Fifty Acres of Land,* 469 U.S. 24, 25–26, 105 S.Ct. 451, 452, 83 L.Ed.2d 376 (1984); *United States v. Miller,* 317 U.S. 369, 373–74, 63 S.Ct. 276, 279, 87 L.Ed. 336 (1943); *Reservation Eleven Associates v. District of Columbia,* 420 F.2d 153, 155 (D.C.Cir.1969) (measure of compensation that must be paid in eminent domain suit is fair market value of property being condemned at time just prior to taking); *Goddard v. D.C. Redevelopment Land Agency,* 287 F.2d 343, 345 (D.C.Cir.), *cert. denied* 366 U.S. 910, 81 S.Ct. 1085, 6 L.Ed.2d 235 (1961) (if plaintiffs do not receive just compensation in condemnation proceedings, their remedy is to appeal). Plaintiffs concede that "the statute and legislative history [of the Appropriations Act] do not discuss whether the amount paid for the properties should be pre- or post-contamination value ..." in the condemnation context, or for that matter, for negotiated acquisitions. (Plaintiffs' Memorandum at 14–15). Congress made no provision as to value, as it did when it decided to acquire property at

Love Canal.[3] Instead, Congress simply appropriated funds for relocation:

> ... notwithstanding any other provision of law, the Administrator of the Environmental Protection Agency shall, from funds previously appropriated under this heading in Public Law 101–507, obligate up to $5,000,000 for Koppers Texarkana Superfund site relocation.

Plaintiffs have not established any basis on which the Court, could hold unlawful and set aside the Carver Terrace purchases under the Administrative Procedure Act.

### Relocation Act Claim

■ Plaintiffs' second count complains of the violation of "Congressional objectives" set forth in the Relocation Act, 42 U.S.C. § 4621, and asserts their statutory entitlement under 42 U.S.C. § 4623 to replacement housing payments that, when added to the acquisition cost of their dwellings, would equal the cost of comparable replacement dwellings. Plaintiffs were notified of their relocation assistance determinations by letters that informed them of their rights to appeal. No plaintiff appealed the initial determination of relocation assistance benefits. There is nothing in the record indicating that appeals would have been "clearly useless". *See Communications Workers of Amer. v. AT & T,* 40 F.3d 426, 432 (D.C.Cir.1994). Count Two must be dismissed for failure to exhaust administrative remedies.

### Claim of Racial Discrimination

■ Plaintiffs' claim of racial discrimination is that "defendants discriminated against them on the basis of race by making threats against them which had not been made to residents of non-minority communities." (Plaintiffs' Memorandum at 36).

■ This equal protection claim, made under the Due Process Clause of the Fifth Amendment, stumbles at the first hurdle, which is the requirement that plaintiffs be similarly situated with those whose treatment they seek to compare with their own.

---

3. 42 U.S.C. § 9661(b): "Compensation for any property acquired pursuant to this section shall be based upon the fair market value of the property as it existed prior to the emergency declaration."

See *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3253, 87 L.Ed.2d 313 (1985); *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). The naked assertion that Carver Terrace is an African–American community and that residents of Times Beach, Missouri, and Forest Glen, New York, were "almost entirely white," (Plaintiffs' Exhibits 32, 34), does not begin to establish the requirement of "similar circumstances," and indeed plaintiffs appear to concede that there were "differences in offers, acquisition practices or other dissimilarities that might well exist based on a variety of factors at different sites." (Plaintiffs' Memorandum at 36). Different treatment of dissimilarly situated persons does not violate the Equal Protection Clause. *See, United States v. Bell,* 506 F.2d 207, 221 (D.C.Cir.1974); *Klinger v. Dept. of Corrections,* 31 F.3d 727, 733 (8th Cir.), *cert. denied,* ── U.S. ──, 115 S.Ct. 1177, 130 L.Ed.2d 1130 (1995).

◼ Even if Carver Terrace residents and residents of several different communities in different states and in different years were found to be "similarly situated," plaintiffs would have to show a discriminatory purpose or intent in order to prevail on their constitutional claim. *See Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979); *Village of Arlington Hts v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 239–241, 96 S.Ct. 2040, 2047–2048, 48 L.Ed.2d 597 (1976). The present motion does not stand or fall on this point, but it should be noted that plaintiffs have neither offered nor identified any evidence of discriminatory purpose. The event of dis-

crimination is said to be the delivery of letters plaintiffs considered threatening, but the letters on their face were appropriate and nonthreatening [4] and do not purport to create classifications of any sort. *Cf. Hazen Paper Co. v. Biggins,* ── U.S. ──, ──, 113 S.Ct. 1701, 1705, 123 L.Ed.2d 338 (1993) (no disparate treatment under the ADEA when factor motivating employer is some feature other than employee's age).

◼ Plaintiffs' most pointed claim of racial discrimination invokes section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a). In making that claim, however, plaintiffs are in approximately the same legal position as the plaintiff in *Dorsey v. United States Dept. of Labor,* 41 F.3d 1551 (D.C.Cir.1994): it was unclear in that case whether the statute under which plaintiff sued provided a private right of action for compensatory damages, but it was held unnecessary to resolve the question because, in any case, the statute did not unambiguously waive the government's sovereign immunity as to monetary claims. Here, plaintiffs submit letters from cabinet officers conceding the government's liability for violations of the Fair Housing Act, (Plaintiffs' Exhibits 36, 37), in an effort to contest or distinguish the First Circuit's decision in *NAACP v. Secretary of Housing and Urban Development,* 817 F.2d 149, 153–154 (1st Cir. 1987), that the federal government cannot be sued directly under that Act. But there is no need to decide that question, because sovereign immunity bars the relief plaintiffs seek. Plaintiffs do what they can to sidestep this problem, claiming their right to "remediation" of the alleged statutory violations and seeking the remedy of "rescission," but counsel made it clear at oral argument that plain-

---

4. In another context it has been held that a "threat" has two elements: fear on the part of the victim (a reasonable belief that the defendant has the necessary power to cause economic harm), and intent on the part of the defendant to exploit that fear. *United States v. Capo,* 817 F.2d 947, 951 (2d Cir.1987) (applying the Hobbs Act, 18 U.S.C. § 1951). No such wrongful intent is shown or even alleged here. A showing that the Corps of Engineers intended to push Carver Terrace residents into selling at the offer prices would not establish the wrongful government conduct necessary to void an agreement on the ground of economic duress. *See, United States v.*

*Vanhorn,* 20 F.3d 104, 112 n. 19 (4th Cir.1994); *Stoddard v. Stoddard,* 641 F.2d 812, 816 (9th Cir.1981) (duress not a question of fact under state law where defendant came to plaintiff's home and refused to leave without some kind of a new agreement; essence of duress is surrender to unlawful or unconscionable demands). There was no Congressional mandate that Carver Terrace residents be paid "clean" value for their homes. The Corps of Engineers may have been on shaky ground had they *failed* to accompany their offers with the information that sellers could expect only fair market value in the event of condemnation.

tiffs are not prepared to tender back the money they received when they sold their Carver Terrace properties without assurance that they would receive greater sums of money immediately. In other words, the only recovery they seek is money. Because the Fair Housing Act does not "unambiguously waive" the government's sovereign immunity defense, plaintiffs may not have a monetary recovery. *United States v. Nordic Village, Inc.,* 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (reaffirming long line of cases holding that waivers of the government's sovereign immunity must be "unequivocally expressed" to be effective where a claimant demands monetary relief).

Defendants' motion for summary judgment will be granted. An appropriate order will issue with this opinion.